# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FRANCES Y. CHOY, | ) |
| | ) |
| Plaintiff, | )      Civil Action No. 1:23-cv-10340 |
| | ) |
| v. | ) |
| | ) |
| CITY OF BROCKTON; Brockton Police Department Detective ERIC CLARK, *in his individual capacity*; Massachusetts State Police Detective RICHARD SCOTT WARMINGTON, *in his individual capacity*; Massachusetts State Police Trooper JOHN DUGGAN, *in his individual capacity*; Massachusetts State Police Chemist JOHN E. DRUGAN, *in his individual capacity*; Massachusetts State Police Sergeant SCOTT A. BERNA, *in his individual capacity*; Massachusetts State Police Captain MICHAEL J. CRISP, *in his individual capacity*; and First Assistant District Attorney FRANK J. MIDDLETON, JR. *in his individual capacity*. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## COMPLAINT AND JURY DEMAND

Plaintiff Frances Y. Choy, by and through her attorneys, the law firms: Neufeld Scheck & Brustin, LLP, and John J. Barter, Esq., alleges as follows:

## INTRODUCTION

1.     Frances Y. Choy was wrongfully arrested, prosecuted, convicted, and imprisoned for nearly seventeen years for crimes she did not commit. At the time of her arrest, Frances was seventeen years old, and was a high school senior with a part-time job who had been accepted to

1

Suffolk University. She had never been arrested, investigated, or charged with any criminal offense.

2.      In the early morning hours of April 17, 2003, Frances's troubled nephew, Sung Ching ("Kenneth") Choy, set fire to 102 Belair Street in Brockton, Massachusetts, where he lived with Frances and her parents, Yiu ("Jimmy") Choy and Nu Trinh ("Anne") Choy. Both Jimmy and Anne died that same day as a result of severe injuries sustained during the fire.

3.      Officers from two investigating agencies, the Massachusetts State Police ("MSP") and the Brockton Police Department ("BPD"), believed the fire had been intentionally set and correctly suspected Kenneth was the perpetrator.

4.      Frances was not involved in the fire or her parents' deaths in any way. However, after an "alert" by a K-9 that the sweatpants she had been wearing *might* contain a flammable substance, co-lead investigators Detective Richard Scott Warmington of the MSP and Detective Eric Clark of the BPD erroneously homed in on Frances as having been involved. Notwithstanding what should have been Frances's obvious actual innocence, Defendants then began to build a case against her based on false and fabricated evidence.

5.      No credible evidence ever connected Frances to the crimes. Apart from a self-serving statement from Kenneth that was the product of police suggestion, the only "evidence" ever implicating Frances was the result of Defendants' unconstitutional misconduct: Warmington, Clark, and MSP Trooper John Duggan coerced Frances into making a false vague admission, which she immediately retracted, and then fabricated a second "confession" containing inculpatory details that matched their perceptions about the crimes at that time.

6.      Thereafter, MSP chemist John E. Drugan fabricated a report that Frances's sweatpants had tested positive for the presence of a "gasoline residue"—falsely suggesting she had used an accelerant.

7.      By contrast, the evidence of Kenneth's guilt was overwhelming. Kenneth wrote (and admitted to writing) two notes that officers found in his room detailing a step-by-step plan to light 102 Belair Street on fire. Unlike Frances, when questioned, Kenneth was able to volunteer accurate details to the police about how he had started the fire, which only the perpetrator could have known. And, at the time of the fire, there was a rolled towel at the base of his bedroom door to protect him from smoke—consistent with the Kenneth's written plan—and no towel under Frances's or her parents' door.

8.      Kenneth also had a clear motive to harm the Choys: Jimmy had recently reported to the Brockton police that Kenneth was dealing drugs, which he was. The Choy family knew that Kenneth was involved with drugs and had sold their belongings in connection with that; Anne had also accused him of stealing her jewelry. Kenneth and Jimmy had a poor relationship, and Kenneth resented the way Jimmy treated him compared to Frances.

9.      Kenneth would later admit to a friend that he started the fire at 102 Belair Street and that he did so out of revenge against Jimmy and Anne Choy.

10.     Nonetheless, Defendants arrested Frances and orchestrated her prosecution by false and fabricated evidence. Defendants then covered up their misconduct by destroying their contemporaneous notes, falsely claiming that the BPD station where Frances allegedly confessed was not equipped to record interrogations at the time, that no police officer had access to any recorders, and concealing from the prosecution and defense that both Frances's alleged

confessions and the report that there was gasoline residue on her sweatpants were products of their misconduct.

11.     At the time of Frances's interrogation, Defendants had a pattern and practice of failing to record interrogations so as to more easily pressure suspects to confess and of reducing only the final and most consistent version of an alleged confession to writing. Moreover, although Defendant Eric Clark falsely testified that officers did not have access to a single video or sound recording device at the time of Frances's interrogation and alleged confession, the BPD used video equipment for recording witness interviews as early as 1990. Around the time of Frances's trial, Massachusetts law required that unrecorded confessions be evaluated with particular caution.

12.     Defendants also concealed a missing person report Jimmy had filed with the BPD recording his suspicion that Kenneth was dealing drugs; this report was never provided to prosecutors, the court, or defense counsel in advance of Frances's trials, despite its obvious use as exculpatory evidence suggesting a motive for Kenneth to commit the crimes.

13.     Frances emphatically maintained her innocence from the moment of her arrest, and Frances's family steadfastly supported her as well.

14.     Despite Defendants' misconduct, the prosecution's case against Frances remained extremely weak. Frances was tried three times, twice resulting in a hung jury and mistrial. After a third trial in May 2011, Frances was wrongfully convicted based on Defendants' false and fabricated evidence, and without the benefit of the exculpatory evidence Defendants hid. Frances was sentenced to life in prison without the possibility of parole.

15.     Frances continued to fight to prove her innocence. On September 17, 2020, Frances's motion for post-conviction relief was granted based on a multitude of factors,

including that: (1) new expert evidence demonstrated that there was actually no gasoline residue on Frances's sweatpants; (2) new evidence of misconduct by BPD Defendants, including misrepresentations around the documentation of Frances's statements;  (3) new evidence that Kenneth acted alone, including that he had confessed to starting the fire; (4) evidence of additional fires at the Choy residence started while Frances was incarcerated; and (5) new evidence of racial bias against Frances, including racist and sexist emails and drawings from the prosecutors.

16.     On September 17, 2020, the Plymouth County Superior Court vacated Frances's conviction. On September 29, 2020, the Plymouth County District Attorney discontinued its prosecution of Frances.

17.     Frances was wrongfully imprisoned from the age of seventeen until the age of thirty-four.

18.     As a direct result of Defendants' misconduct, Frances was incarcerated for nearly seventeen years and suffered injuries and damages, including but not limited to: pain and suffering, severe mental anguish, emotional distress, lost income, physical illness, inadequate medical care, humiliation, injury to reputation, permanent psychological damage, and restrictions on all forms of person freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, family relations, travel, enjoyment, and expression. These injuries began in 2003 and continue to date.

## JURISDICTION AND VENUE

19.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

20.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

21.     Venue is properly laid in the District of Massachusetts under U.S.C. § 1391(b), in that this is the District in which the claim arose.

22.     Plaintiff respectfully demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the United States Constitution and Fed. R. Civ. P. 38(b).

23.     Plaintiff has complied with the requirements of Massachusetts Tort Claims Act G.L. c. 258 § 1, et. seq. Plaintiff served the City of Brockton with a presentment letter dated March 7, 2022, and served the Commonwealth of Massachusetts with a presentment letter dated June 30, 2022. As of the date of this filing, Plaintiff has not received any response from either the City of Brockton or the Commonwealth of Massachusetts.

## PARTIES

24.     Plaintiff Frances Y. Choy is thirty-seven years old and lives in Quincy, Massachusetts. Frances was wrongfully incarcerated by the Commonwealth of Massachusetts from her arrest in 2003 until her release in 2020.

25.     At all relevant times, Defendant Eric Clark was employed as a detective by the BPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Brockton and the Commonwealth of Massachusetts. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

26.     At all relevant times, Defendant Richard Scott Warmington was employed as a detective by the MSP, acting under color of law and in his individual capacity within the scope

of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the Commonwealth of Massachusetts. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

27.     At all relevant times, Defendant John Duggan was employed as a State Trooper by the MSP, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the Commonwealth of Massachusetts. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

28.     At all relevant times, Defendant John E. Drugan was employed as a chemist by the MSP, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the Commonwealth of Massachusetts. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

29.     At all relevant times, Defendant Scott A. Berna was employed as a Sargent in the Massachusetts State Police, acting under color of state law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the Commonwealth of Massachusetts. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

30.     At all relevant times, Defendant Michael J. Crisp was employed as a Captain in the Massachusetts State Police, acting under color of state law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the Commonwealth of Massachusetts. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

31.     At all relevant times, defendant City of Brockton was responsible for the policies, practices, and customs of the BPD. The City of Brockton is responsible for the acts of Defendant Clark while employed by the City of Brockton and while acting under color of law and within the scope of his employment.

32.     At all relevant times, Defendant Frank J. Middleton, Jr. was employed as First Assistant District Attorney, acting under color of state law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the Commonwealth of Massachusetts. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

33.     At all relevant times, all Defendants were acting under color of state law.

## FACTUAL ALLEGATIONS

### Kenneth sets fire to 102 Belair Street and kills Jimmy and Anne.

34.     In the early morning hours of April 17, 2003, Kenneth intentionally set fire to the house at 102 Belair Street in Brockton where he was living with Jimmy Choy (his grandfather), Anne Choy (his step-grandmother), and Frances Choy (his 17-year-old aunt).

35.     Approximately two years prior, Kenneth had arrived from Hong Kong to live with the Choys and was not getting along with them. After one dispute between Jimmy and Kenneth in January 2003, after Jimmy learned that Kenneth was dealing drugs, Kenneth temporarily ran away from home.

36.     In advance of setting the fire, Kenneth drew up a detailed, step-by-step written plan for the arson, including filling plastic containers with gasoline and placing them strategically around the house, lighting fires, returning to his room, rolling up a towel to place

under his door to protect himself from the fire, changing clothes, and waiting for rescue personnel to come or, if necessary, jumping out of his bedroom window.

37. Kenneth executed this plan, and then retreated to his room on the second floor, closed and locked the door, and placed a rolled towel at the base of the door to protect himself from the effects of the fire. He opened his window but did not call 911.

38. Flames, heat, and smoke from the fire spread throughout the home while Frances and her parents were asleep in their respective second-floor bedrooms.

39. Frances was awakened by the sound of her mother screaming her name and that there was a fire. Frances, unable to breathe, used all her strength to force her bedroom window open in order to get fresh air and then called 911 on her cell phone. She then waited for rescue personnel to arrive.

40. Brockton Fire Department ("BFD") personnel arrived on the scene at approximately 5:00 a.m. and saw Frances and Kenneth in their second-story bedroom windows. Frances advised firefighters that her parents were still inside before being rescued and directed firefighters to her parents' bedroom. Frances and Kenneth were then transported to Good Samaritan Hospital in Brockton.

41. BFD firefighters also extracted a non-responsive Jimmy and Anne from their room on the second floor and took them to Good Samaritan Hospital. It was immediately apparent that their injuries were severe. Anne was pronounced dead shortly after arriving at Good Samaritan Hospital, and Jimmy was transferred to Brigham & Women's Hospital in Boston for further critical care treatment; he died later that day.

**The house is full of evidence implicating Kenneth, and none implicating Frances.**

42. At the scene, the physical evidence implicating Kenneth was overwhelming.

43.    The most smoke and heat damage to the house was sustained in Jimmy and Anne's bedroom, and Frances's bedroom sustained more smoke and heat damage than Kenneth's room. Kenneth's room was the only room where a rolled towel was found near the base of the door, which would have helped protect him from the effects of the fire.

44.    During the execution of a search warrant at the house, officers moved a bed in Kenneth's bedroom and uncovered a note written on stationery printed with "A Note from Kenneth Choy." Kenneth's fingerprints (and no one else's) were found on the note, and he admitted to officers that he had written it. The note laid out Kenneth's step-by-step plan for setting fire to 102 Belair Street.



45.     A second note, written in shorthand but describing a similar series of actions, was found in Kenneth's room with only his fingerprints on it. He also admitted to writing the second note.

46.     Berna was present for the collection of evidence at the scene, and he found no such incriminating evidence during his search of Frances's bedroom.

47.     Consistent with the steps laid out in Kenneth's notes, several plastic containers were found in the house. An accelerant detection canine known as K-9 Gala allegedly alerted to the remains of a melted plastic container in Jimmy and Anne Choy's bedroom. Gala's handler also observed the remains of a similar melted plastic container on the stairs from the main floor to the second floor. The path of the fire to the second floor put Frances in danger, but did not similarly but Kenneth in danger.

48.     Earlier that morning, Clark had entered the house and noticed two plastic containers on the stairs from the basement to the main floor of the house, which contained a liquid that he believed to be gasoline. He brought them to Warmington's attention.

**Frances is innocent and is not involved in causing the fire.**

49.     Frances is an innocent victim of Kenneth's arson. She had no involvement in setting the fire that burned down her house and killed her parents.

50.     The evening before the fire, Frances worked a shift at her part-time job at OfficeMax until 9:30 p.m. She returned home, spent time with her parents, and then went to her room. Before Frances went to bed, her father applied some pain relieving oil to her legs because her feet hurt from wearing high heels at work.

51.     The first Frances knew anything about the fire was when she woke in her bedroom to her mother's screams. By that point, the fire and heat had spread to the extent that Frances could not safely leave her bedroom. Frances had difficulty opening the window and feared she would not be able to open it but eventually succeeded. After calling 911, she stayed on the line as directed by the 911 operator, and waited by the open window to be rescued. Frances thus had no knowledge of the manner in which the fire was set.

**After an accelerant detection canine alerts to Frances's sweatpants, Warmington and Clark erroneously claim she must have been involved.**

52.     Detective Richard Scott Warmington was assigned as the lead investigator for the MSP and Detective Eric Clark as the lead investigator for the BPD.

53.     Warmington briefly visited the scene before heading to Good Samaritan Hospital, where he met with Clark and a BFD Captain at approximately 7:40 a.m.

54.     At the hospital, they viewed Anne's body and collected her nightgown, which Warmington placed into a bag.

55.     Warmington requested permission to take the clothing that Kenneth and Frances were wearing. They both agreed, and their clothing was placed into separate bags provided by the hospital for transport.

56.     At approximately 9:15 a.m., Warmington and Clark returned to the scene and met with the fire investigator assigned to the case. The fire investigator informed them that K-9 Gala had been brought to the scene by her handler.

57.     Warmington provided Gala's handler with the clothing he had collected from Anne, Kenneth, and Frances at the hospital.

58.     Gala's handler placed the clothing on a steel door that he had found in the backyard leaning up against the house and deployed K-9 Gala on the clothing.

59.     K-9 Gala was a Labrador Retriever trained to detect and alert to the presence of certain *potential* flammable liquids. Such dogs, however, are only tools used as part of an investigation and cannot definitively confirm the presence or absence of a specific substance, nor do they distinguish among the many different types of substances to which they are trained to alert. Many harmless substances, including those frequently found in cosmetics, such as the acetone in nail polish remover, can cause a dog to alert on an item.

60.     K-9 Gala reportedly alerted on Anne's nightgown and a pair of sweatpants belonging to Frances. K-9 Gala also reportedly examined Frances's sweatpants further and pinpointed one specific spot towards the ankle hemline. Defendants did not record any alert by K-9 Gala on the clothing Kenneth was wearing at the time emergency personnel responded to the fire (consistent with Kenneth's step-by-step written plan for committing the arson which included a step for changing his clothes after using the accelerant).

61.     Nonetheless, apparently as a result of K-9 Gala's reported alert on Frances's sweatpants, and with total disregard for the alert's minimal evidentiary value along with many innocent explanations for it, Defendants focused on Frances as their prime suspect.

**Warmington and Clark suspect foul play and interrogate Kenneth and Frances at the hospital.**

62.     Based on early assessments at the scene, officers quickly surmised that the fire had been intentionally set.

63.     Warmington, Clark, and a BFD Captain separately interrogated both Kenneth and Frances.

64.     Warmington, Clark, and the BFD Captain interrogated Frances beginning at approximately 8:20 a.m., while she was receiving treatment for complications from the fire, including oxygen. She answered background questions about her family and the incident and truthfully denied any involvement. When asked if anyone at the residence had any problems, Frances mentioned that there was recent car vandalism at their home arising from a dispute between Kenneth and people he knew from school.

65.     While at the hospital, Warmington and Clark also spoke to Nhan Chiang, a relative of the Choys. She told them that the Choys recently had been victims of vandalism and that she believed the vandalism was related to a problem Kenneth had with several classmates.

14

Ms. Chiang also told Warmington and Clark that only a few weeks prior, Anne had confronted Kenneth and accused him of stealing her jewelry. She further reported that Kenneth used to work at OfficeMax but had been caught stealing; Kenneth's manager later confirmed he had been fired for stealing.

### Warmington and Clark interrogate Frances a second time in an unmarked police vehicle and while en route to see her dying father.

66.     After receiving treatment at Good Samaritan Hospital, Kenneth and Frances were both released and went to a relative's house. Frances showered but ate very little and did not sleep. One of her relatives told Frances to return to 102 Belair Street to see if she could salvage any clothing because she had none of her own.

67.     After Frances arrived at 102 Belair Street at approximately 10:15 a.m., she was approached by Warmington and Clark, who proceeded to interrogate her for a second time in Warmington's unmarked police vehicle.

68.     Several other friends and family of Frances's were also present at the scene, including her cousin Nghi Huynh (who now goes by the name Nghi Zamora). At some point, Ms. Huynh approached Warmington's vehicle and asked the officers to allow Frances to ride with her to Boston to see Jimmy, who was in critical condition at Brigham & Women's Hospital. Warmington and Clark refused.

69.     Eventually, Warmington and Clark relented but insisted that they would drive Frances to Brigham & Women's Hospital to see her father themselves. They continued to interrogate her throughout the entire drive to Boston.

70.     Warmington and Clark repeatedly accused Frances of having gasoline on her sweatpants, which she truthfully denied.

71.     After arriving at Brigham & Women's Hospital, as Jimmy's next of kin, Frances was faced with the decision of whether to take her father off life support. She was overcome by the grief and emotion of losing her father and was crying hysterically. She begged her unconscious father not to leave her and had to be physically restrained by her family members.

72.     Frances initially wanted to continue to keep her father on life support; the doctors said that Jimmy Choy may be able to live for two weeks more. Frances's aunts and uncles thought he should be taken off life support immediately, because in their culture, if a husband and wife pass away at the same time, they will find each other in the afterlife. Because Frances's father was considered "brain dead," Frances's aunts and uncles also thought taking him off life support would end his suffering and that it would be easier to plan a joint funeral than two separate funerals. Frances eventually agreed to take her father off life support at the advice and urging of her senior family members.

73.     While Frances was with her dying father, Warmington and Clark interrogated Kenneth a second time in a conference room at Brigham & Women's Hospital. He again denied any involvement in the crimes but painted a stark picture of his life at 102 Belair Street. He told the officers that Jimmy very rarely spoke to him and treated him poorly. He told the officers that Jimmy was extremely strict, and verbally and physically abused him. Kenneth admitted that Anne had recently accused him of stealing her jewelry, although he denied having done so.

74.     At some point while they were both at Brigham & Women's Hospital, Frances told Kenneth that Warmington and Clark had interrogated her on the way to the hospital and that they had told her gasoline had been found on her sweatpants.

**Warmington, Clark, and Duggan interrogate Frances a third time at the BPD station, where they coerce one false "confession" from her and fabricate another to bolster their weak case.**

75.     After her father died, Frances left the hospital. At approximately 5:55 p.m., Warmington contacted her and asked that she return to 102 Belair Street.

76.     Warmington told Frances that the investigation had been completed, and she could return to the house to get her belongings. Warmington said he would wait at the house for her to arrive.

77.     Frances tried to decline, but Warmington insisted, and she acquiesced when Warmington told her she would need to come to the scene to recover personal property. At approximately 7:35 p.m., Frances and Kenneth both arrived and spoke briefly to Warmington. Warmington told them that the belongings they could salvage were at the police station. He asked them to accompany him to the BPD station to view items recovered from the residence. However, the police did not want to show her any items from the fire, they wanted to interrogate her.

78.     This interrogation was not recorded, despite the fact that there were recording devices available at BPD. Frances repeatedly asked for a lawyer but did not receive one. By that point, her physical and mental state was understandably taxed and depleted. Frances, at only seventeen years old, had been awake since before dawn, when she had heard her mother screaming that the house was on fire. She had learned her mother had died in the fire. She had visited her father in the hospital after he had been badly burned and given her consent to take him off life support. She hadn't eaten for most of the day. In this vulnerable state, she was subjected to increasingly aggressive interrogation. In addition to all of this, she had no prior experience with the police in any context.

79.     Upon her arrival at the BPD station, Frances expressed to officers her pressing need to use the bathroom but was not permitted to do so. She was told that she could not use the bathroom because there was no female police officer available to escort her. When Frances was finally taken to the bathroom hours later, a female officer urged her to confess.

80.     During this third interrogation, Frances was badgered, accused, and verbally abused. Defendants repeatedly told Frances that she was a liar and falsely told her that if she told the truth (i.e. confessed to crimes she had repeatedly denied), she would get to go home, but that if not, she would be locked up. Nonetheless, for hours, Frances denied any involvement despite the relentless pressure from Warmington, Clark, and Duggan.

81.     Defendants also brought Frances's cousin, Nhan Chiang, into the interrogation and told Ms. Chiang that she should instruct Frances to tell the officers the truth about the fire.

82.     At some point, Warmington stepped out of Frances's interrogation to conduct a separate interrogation of Kenneth, in which MSP Trooper Christopher Dolan and MSP Trooper Diane Lilly also participated.

83.     Defendants confronted Kenneth with the two notes that had been found in his room detailing his step-by-step plan to set fire to 102 Belair Street. Kenneth initially tried to deny writing them at all, then when that was shown to be obviously false, he told the officers a farfetched story blaming "Black kids" from school who he falsely claimed told him to write it to avoid bad luck. Then finally he capitulated and admitted that the letters were what they appeared to be on their face—his handwritten plan to set fire to 102 Belair Street.

84.     Kenneth confessed to involvement in the fire and was able to volunteer many of the salient details of the crime. For example, Kenneth correctly admitted to filling empty plastic

containers from a red gas can that was kept in the basement and placing two plastic containers full of gasoline on the stairs from the basement to the main floor of the house.

85.     However, Kenneth knew that Warmington and Clark had interrogated Frances on the way to Brigham & Women's Hospital and knew that they had (falsely) told her gasoline had been found on her sweatpants. Upon information and belief, police then told Kenneth he could lessen his blame if he told them another person was involved in setting the fire.

86.     Kenneth then falsely incriminated Frances. He falsely minimized his own role, claiming Frances was actually the one who started the fire.

87.     Kenneth's attempt to implicate Frances was not credible in light of the evidence of his own guilt, including the handwritten notes and rolled up towel under his door, as Kenneth obviously had a motive to shift blame away from himself and on to Frances. Defendants knew that Kenneth's statements, without any reliable evidence implicating Frances, would not be enough to convict her. Because they had already committed to their incorrect theory that she must have been involved, they doubled down and fabricated a confession from her.

88.     Defendants confronted Frances with the fact of Kenneth's confession, fed her several specific details about how he had admitted to committing the crimes, and asked her leading questions regarding the fire. Frances continued to vehemently deny any involvement and Defendants continued to refuse to accept her truthful denials.

89.     Eventually, after hours of pressure to confess to crimes she did not commit, after being repeatedly told that she would be arrested and locked up if she did not confess, and after being falsely told she would be permitted to go home if she did, Defendants overbore Frances's will, and she acquiesced to their pressure, saying "fine I planned it!" Immediately thereafter,

Frances told Defendants that she didn't plan it. She reiterated that she didn't know what had happened and that it wasn't her.

90.     Clark and Duggan then escorted Frances to the booking area and handcuffed her to a railing. They once again pressured Frances to confess to a crime she did not commit with the false promise that she could go home if she agreed to state that she caused the fire.

91.     Clark then asked a series of leading questions regarding how the crime allegedly occurred and Frances said "yes" to each question. Defendants then fabricated a report of this exchange, falsely suggesting Frances had volunteered this description of the crime to make it seem like she had incriminating knowledge.

92.     But Frances was completely innocent and had no involvement in the crime. Even though she was present at the house at the time of the fire, she never left her room due to the fire's spread and was then rescued from her bedroom window. She did not know how the crime occurred.

93.     Even though Defendants' pressure to admit involvement temporarily overbore her will, Frances could not provide details about how the crime occurred because, unlike Kenneth, she did not know them. Defendants recognized that Frances's bare and temporary admission, which she made because she wanted to go home but immediately retracted, was not persuasive evidence. Defendants repeatedly asked her to provide a detailed narrative of what happened, but she could not.

94.     According to Warmington and Clark's typed police reports, while she was waiting outside the booking area, Frances made an admission to Duggan and he informed Clark, who proceeded to take an additional "confession" from Frances. They claim that Frances admitted that she put "plastic cups from downstairs and that they were milk and soda containers" that she

filled from a gas container outside—one on each stair from the basement up to the main floor, before again immediately retracting the statement.

95.     Several of the details in this "confession" were partially correct and consistent with Kenneth's confession: (1) the fact that at least some of the plastic containers were empty Sprite (soda) bottles, (2) the fact that they were filled from a gas container, and (3) the fact that they were placed on the stairs.

96.     Frances's "confession" outside the booking area was not reduced to writing so that she could verify its accuracy or inaccuracy. Nor was it audio or video recorded. The only existing written account of the "confession" was typed up days later as a collaborative effort by the Defendants prepared after the Defendants had fully formulated their theory of the case.

97.     By April 2003, BPD detectives had access to recording equipment that they could use, and did use, to record statements of witnesses or suspects. The readily available equipment included portable tape recorders. Still, they intentionally did not record Frances's statements.

98.     Nonetheless, Frances was arrested along with Kenneth for the arson of 102 Belair Street and the murder of both of her parents.

**Drugan falsely reports that Frances's sweatpants are positive for the presence of a "gasoline residue."**

99.     MSP chemist John E. Drugan was assigned to handle the laboratory testing of Frances's sweatpants, along with the testing of several other items collected from the scene.

100.    Drugan was informed by Warmington, Clark, or another MSP/BPD officer before he conducted testing on the sweatpants that K-9 Gala had alerted to them: his April 22 lab notes (three days before his April 25 GC-MS results) contained handwritten "K-9 Gala" and "+ Gas" notations in the description of Item #1 (the sweatpants).

101.   Drugan also exchanged messages discussing the testing of the sweatpants, including that testing them would involve a destructive test, with Middleton. Upon information and belief, Middleton approved the destructive test rather than opting for preserving a portion of the item so that it would be available for subsequent testing by the defense.

102.   Drugan tested the sweatpants, analyzed the testing data, and falsely reported that the sweatpants were positive for the presence of a "gasoline residue." His own testing data did not support that conclusion.

103.   The testing data did contain information useful in determining other substances beside gasoline or a gasoline residue that were likely to have been on the sweatpants. This analysis indicated the probable presence of a compound called methyl salicylate, which is often included in commercially-available topical analgesics.

104.   Nonetheless, at trial, the prosecution's case relied heavily on Drugan's false testimony about the sweatpants because it was the only physical evidence ever purporting to link Frances to the crimes.

**Warmington and/or Clark bury evidence implicating Kenneth.**

105.   Prior to Frances's conviction, Warmington and/or Clark learned of key pieces of evidence implicating Kenneth as the true perpetrator and exonerating Frances, but failed to disclose them to the prosecution, court, or defense counsel. Defense did not discover that Warmington and/or Clark had been aware of this additional evidence until it was disclosed as part of Frances's post-conviction case.

### *Warmington and Clark fail to disclose that Jimmy had reported to the BPD that Kenneth was dealing drugs.*

106.    On or about January 11, 2003, Jimmy and Kenneth had a dispute and Kenneth ran away from home. Jimmy had recently learned that Kenneth was dealing drugs. Jimmy contacted the BPD when Kenneth failed to come home and a missing person report was generated. The missing person report, dated January 11, 2003, reflected the fact that Jimmy had informed the BPD of Kenneth's drug dealing.

107.    In addition, a BPD computer-aided dispatch system report, dated January 11, 2003, and printed on May 28, 2003, (well before Frances's first trial), also reflected the fact that Jimmy had informed the BPD about Kenneth's drug dealing.

108.    Frances was not aware that Jimmy had informed the BPD about Kenneth's drug dealing.

109.    Both of these documents would have been powerful exculpatory evidence tending to suggest an additional motive for Kenneth to commit the crimes independent of Frances. However, neither these documents nor the fact of the incident was disclosed to the prosecution, court, or defense counsel until years after Frances's conviction, when copies of the two documents were discovered in Clark's files.

### *Warmington and/or Clark fail to disclose a subsequent fire at 102 Belair Street.*

110.    At or around midnight on Friday, September 25, 2009, BPD officers and BFD personnel responded to a second fire at 102 Belair Street. After the fire was extinguished, a BPD officer and BFD lieutenant secured the entry to the house with plywood.

111.    The next day, on the afternoon of Saturday, September 26, 2009, BFD personnel once more noticed smoke coming from 102 Belair Street. Someone had removed the plywood, entered the house, and lit the couch on the main floor on fire.

23

112.    A BPD dispatch log entry dated September 26, 2009, erroneously stated that "[t]he couch was not involved in the [April 17, 2003] homicide fire." The log entry also indicated that the couch had not been involved in the fire the previous day, September 25.

113.    At the time of both of the 2009 fires, Frances was incarcerated pending trial; she could not have participated in them.

114.    Upon information and belief, as co-lead investigators, Warmington and Clark would have been aware of all pertinent developments in the case.

115.    Information regarding any subsequent fire at 102 Belair Street—particularly one involving a couch that was one of the potential origination points of the April 17, 2003, fire— would have been powerful exculpatory evidence tending to suggest that the true perpetrator was not incarcerated at that time and had returned to the scene of the crimes to destroy evidence. However, the full nature of the September 26, 2009, fire was not disclosed to the prosecution, court, or defense counsel until years after Frances's conviction.

116.    The September 25, 2009, fire *was* disclosed to the prosecution, and e-mails between co-lead prosecutors ADA John Bradley and ADA Karen O'Sullivan made clear their acute understanding of how detrimental this was to their case against Frances: On September 25, ADA Bradley e-mailed ADA O'Sullivan and said, "Kenneth did make bail didn't he?" to which she quickly responded, "You should just NP [nolle prosequi] Frances's case right now."

117.    Upon information and belief, Defendants disclosed the September 25, 2009, fire to prosecutors because they believed that one subsequent fire could be explained away in any number of ways. They knew, however, that a *second* subsequent fire set to important evidence at the scene of the crimes threatened to scuttle their case against Frances, and thus chose not to disclose the September 26, 2009, fire.

**Warmington and Clark ignore the lack of credible evidence against Frances and arrest her along with Kenneth.**

118.    Warmington and Clark knew that no legitimate evidence pointed to Frances, and that, to the contrary, there was plenty of evidence pointing to Kenneth.

119.    In fact, apart from Kenneth's attempt to deflect blame from himself onto Frances, the only "evidence" ever implicating Frances were coerced admissions and fabricated statements: her coerced statement that "fine I planned it!" (which Frances immediately retracted); the fabricated "confession" she allegedly made to Clark outside the booking area (which Frances immediately retracted); and Drugan's fabricated report about there being a "gasoline residue" on Frances's sweatpants.

120.    With no actual motive for Frances to set fire to her home and kill her own parents, Defendants created a narrative about how Frances must have committed the crimes for less than $80,000 of life insurance money, stating that Frances had volunteered information about the insurance policies.

121.    In fact, Defendants had told Frances that she did not need to be concerned about losing her belongings because insurance would likely recover replacing them. Defendants then asked Frances about her parents' insurance. Frances knew her parents' insurance carrier because she paid their bills. Frances truthfully answered their questions. Warmington and Clark intentionally misrepresented that Frances had brought up her parents insurance in an incriminating manner, when in fact, the topic of insurance originated with them.

122.    Warmington and Clark knew that much the evidence against Frances was false and/or fabricated because they were the ones who fabricated it.

123.    Nonetheless, after her alleged "confession" to Clark at the BPD station on the evening of April 17, 2003, Frances was wrongfully arrested alongside Kenneth for arson and the murder of both of her parents.

124.    From the moment of her arrest, Frances insisted on her innocence.

**The supervisory defendants knew or had reason to know of the line officers' misconduct.**

125.    Beginning on April 17, 2003, the day of the fire, Captain Crisp received numerous, detailed reports about the investigation and different MSP officer's actions in the case. Although the reports were formally "to" Crisp, both Crisp and Berna's initials appear on several of the reports. Upon information and belief, Berna received and read all reports sent to Crisp.

126.    Berna was Warmington's supervisor and received verbal updates from Warmington and other MSP officers throughout the day on April 17, 2003. He responded to the scene; assisted with and was present for the collection of evidence; met with Clark, Warmington, and other officers at the District Attorney's office; and conducted interviews of Frances's relatives.

127.    Berna and Clark also interviewed Frances's boyfriend, William Som, at the Brockton Police Station around the time of Frances's and Kenneth's interrogations at the station. Berna knew or should have known of Warmington's and Clark's coercive techniques and their decision to fabricate statements from Frances.

128.    Crisp and Berna closely monitored the investigation. Based on the circumstances, they knew or should have known that the evidence in the case pointed to Kenneth and that the case against Frances was built on coercion and lies.

**Clark systematically destroys his notes, thereby destroying potentially exculpatory and impeachment material.**

129.    The BPD had a policy, practice, or custom of destroying investigatory notes before the completion of a prosecution.

130.    During the time in question, the BPD knew that officers should preserve investigatory notes because the destruction of such notes would include the destruction of discoverable material.

131.    The BPD's policy of destruction, therefore, necessarily included the destruction of some exculpatory material.

132.    Consistent with the BPD's policy, custom, or practice, Clark chose to take notes during the Choy investigation but to then destroy his notes, assuring that there would be no contemporaneous record that might be inconsistent with Clark's theory of the case as it was subsequently developed in consultation with additional Defendants and others.

**The BPD had a practice or custom of withholding potentially exculpatory information with the prosecution.**

133.    The BPD also had information in its file about Kenneth's motive for starting the fire that it withheld from prosecutors.

134.    Jimmy had reported to police that Kenneth was dealing drugs and that Kenneth had run away from home. Clark possessed this evidence yet failed to disclose it to the prosecution or defense prior to trial.

135.    Jimmy's report was discovered in the BPD file long after it should have been turned over. Upon information and belief, the structure of the BPD thwarted the sharing of exculpatory evidence, amounting to a practice or custom of withholding exculpatory material.

**Frances is tried three times before she is convicted.**

136.    Frances was charged with one count of burning of a dwelling house and two counts of murder in an indictment dated June 13, 2003.

137.    Although she was only seventeen at the time of the crimes, Frances stood trial as an adult in Plymouth County Superior Court not once, not twice, but *three* times on these charges—crimes she did not commit.

138.    Frances was held without bail in pretrial detention for 4.5 years prior to her first trial. Her defense attorney moved to suppress Frances's alleged confessions on the grounds that Defendants conducted two custodial interrogations without advising Frances of her *Miranda* rights and that Frances did not knowingly waive her *Miranda* rights during a third custodial interrogation. Her lawyer also argued that certain statements were obtained after BPD ignored Frances's request for an attorney. The court denied the suppression motion in part based on Warmington's misrepresentations.

139.    Frances's first trial took place in January 2008. Plymouth County ADAs Bradley and O'Sullivan co-lead the prosecution. Bradley and O'Sullivan argued that Frances was the principal and that she set the fire. They relied on coerced admissions, fabricated evidence, the fabricated confession from Frances, and withholding evidence of Kenneth's motive. This very weak case against Frances ended with a hung jury, and a mistrial was declared on January 24, 2008.

140.    After spending almost three additional years in pretrial detention, Frances's second trial took place in early 2011. Once again, the prosecution relied on coerced admissions, fabricated evidence, and the fabricated confession from Frances; the prosecution again withheld

evidence of Kenneth's motive. Once again, even with Kenneth's live and immunized testimony, the trial ended with a hung jury, and a mistrial was declared on February 11, 2011.

141.    In May 2011, Frances was tried for a third time. At the third trial, the prosecution relied on the same fabricated evidence to support its theory and buried exculpatory evidence. Kenneth Choy fled to Hong Kong days before this third trial, but the court allowed his testimony to be presented with a different person "playing the part" of Kenneth Choy in a reading of the transcribed testimony. This time, however, on May 16, 2011, Frances was convicted of both arson and the murder of her parents. She was sentenced to two concurrent life sentences on the murder convictions, plus a concurrent term of incarceration for the arson conviction.

**Frances's fight to prove her innocence leads to the discovery of additional evidence of misconduct and her conviction is ultimately vacated.**

142.    From the moment of her arrest, Frances fought to prove her innocence. That fight continued even after her wrongful conviction.

143.    During Frances's postconviction case, evidence of Defendants' misconduct and Frances's innocence kept coming, including that: the report concluding that Frances's sweatpants tested positive for gasoline was fabricated; the police withheld that Jimmy had filed a missing person report for Kenneth; and there was evidence that Kenneth was the true perpetrator of the arson, including that he had admitted to a friend that he committed the crime. In the post-conviction stage it was also revealed for the first time that the prosecuting attorneys exchanged emails, photographs, and images showing a bias against Asian people, and a bias against Frances and her family.



| From: | OSullivan, Karen (PLY) |
| --- | --- |
| Sent: | Wednesday, September 30, 2009 12:04 PM |
| To: | Bradley, John (PLY) |
| Subject: | RE: |

are you joking?  That is frances...  a little cut and paste.

**From:** Bradley, John (PLY)
**Sent:** Wednesday, September 30, 2009 12:03 PM
**To:** OSullivan, Karen (PLY)
**Subject:** RE:

Wow....that could be Frances,looks  just like her.

**From:** OSullivan, Karen (PLY)
**Sent:** Wednesday, September 30, 2009 11:58 AM
**To:** Bradley, John (PLY)
**Subject:**

| | |
|---|---|
| **From:** | OSullivan, Karen (PLY) |
| **Sent:** | Wednesday, September 9, 2009 4:47 PM |
| **To:** | Bradley, John (PLY) |
| **Subject:** | RE: Choy |

You will be happy to know that me and Galibois are back on! We talked today for the first time in weeks (he is still a very creepy dude). We had a case on today, and of course the ice breaker was Kenny Choy. I think he is feeling nervous that you won't use Kenny after all and he will be out of the lime light. I haven't looked to see what # my case is on in the Appeals court, I hope they are not at the same time. I will show up tomorrow wearing a cheongsam and will be the one doing origami in the back of the court room. My guess is that there is no way Krowski will make it there for case #1.

---

**From:** Bradley, John (PLY)
**Sent:** Wednesday, September 09, 2009 12:31 PM
**To:** OSullivan, Karen (PLY)
**Subject:** Choy

just got a call from Jane Lewis at SJC...my first thought was that she was going to say that we were off the list,but instead she told me that we have been bumped up to #1...we'll see if Krowski is on time.Can you text Galibois and let him know?

## **PLAINTIFF'S DAMAGES**

144.     The unlawful, intentional, willful, deliberately indifferent, reckless, or bad-faith acts and omissions of Defendants caused Frances to be falsely arrested and imprisoned, unfairly tried, wrongfully convicted, and forced to grieve the murder of her parents while incarcerated for nearly seventeen years for crimes she did not commit.

145.     As a direct result of Defendants' intentional, bad-faith, willful, wanton, reckless, or deliberately indifferent acts and omissions, Frances sustained injuries and damages that continue to date and will continue into the future, including: loss of freedom for nearly seventeen years, pain and suffering, severe mental anguish, emotional distress, loss of family relationships, severe psychological damage, loss of property, legal expenses, loss of income, humiliation, indignities and embarrassment, degradation, permanent loss of natural psychological development and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity,

personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which she is entitled to monetary relief.

146.    Specifically, and as a direct result of Defendants' intentional, bad-faith, willful, wanton, reckless, or deliberately indifferent acts and omissions, Frances sustained physical injuries and damages, including: physical pain and suffering, personal injuries, infliction of physical illness and inadequate medical care, for which she is entitled to monetary relief.

147.    In addition to the physical injury of being wrongfully imprisoned and confined for nearly seventeen years, Frances suffered additional physical harm while incarcerated as a direct result of Defendants' intentional, bad-faith, willful, wanton, reckless, or deliberately indifferent acts and omissions.

148.    All of the acts and omissions committed by the Defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently, or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

## **FEDERAL CLAIMS**

### **COUNT I:**

**Against Defendants Warmington, Clark, Duggan, Drugan, Berna, and Middleton
Deprivation of Liberty Without Due Process of Law and Denial of a Fair Trial by
Fabricating Evidence and Deliberately Suppressing Material Evidence
Under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments**

149.    Plaintiff Frances Y. Choy hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

150.     Defendants Warmington, Clark, Duggan, and Drugan, and Berna acting individually and in concert, deprived Frances of her clearly established constitutional right, under the Fifth and Fourteenth Amendments of the United States Constitution, to a fair trial.

151.     Defendants deprived Frances of her right to a fair trial by fabricating inculpatory evidence. In particular, they fabricated "confessions" by her containing non-public facts that they learned from their investigation.

152.     Defendants deprived Frances of her right to a fair trial by destroying their notes, which include potentially exculpatory and impeachment evidence, and by deliberately withholding material exculpatory and impeachment evidence from prosecutors and defense, including without limitation the fact of Jimmy and Kenneth's fight, which would have further demonstrated Kenneth's motive to commit the crimes.

153.     Middleton, acting in an investigatory role, authorized an unnecessary, destructive test of Frances's sweatpants. Such a test was contrary to established standards in 2003 which dictated that a portion of the evidence be preserved for defense testing. In doing so, Middleton acted in bad faith to destroy exculpatory evidence, depriving Frances of her clearly established constitutional right under the Fifth and Fourteenth Amendments of the United States Constitution to a fair trial.

154.     Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Frances's clearly established constitutional rights.

155.     No reasonable officer in 2003 would have believed this conduct was lawful.

156.    Frances is completely innocent of the arson of 102 Belair Street and the murder of her parents. The prosecution terminated in her favor when the judgments of conviction and sentences were vacated and dismissed.

157.    As a direct and proximate result of Defendants' actions, Frances was wrongly convicted and imprisoned for nearly seventeen years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT II:

**Against Defendants Warmington, Clark, Duggan, Drugan, and Berna**
**Malicious Prosecution**
**Under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments**

158.    Frances hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

159.    Defendants, with malice and knowing that probable cause did not exist to arrest Frances and prosecute her for arson and murder, acting individually and in concert, caused Frances to be arrested, charged, and prosecuted for that crime, thereby violating her clearly established right, under the Fourth and Fourteenth Amendments of the United States Constitution, to be free from unreasonable searches and seizures.

160.    Specifically, Defendants, acting individually and in concert, fabricated evidence and intentionally withheld from and misrepresented to prosecutors and the grand jury exculpatory facts that vitiated probable cause against Frances and would have impeached witnesses for the prosecution at trial, including but not limited to the fact that Jimmy had reported Kenneth's drug dealing to the BPD and that there had been not one but two subsequent fires at 102 Belair Street while Frances was incarcerated, and that Defendants had withheld exculpatory and impeachment evidence. These Defendants also failed to conduct a

34

constitutionally-adequate investigation in light of evidence pointing to other suspects and away from Frances.

161.    Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Frances's clearly established constitutional rights.

162.    No reasonable officer in 2003 or 2009 would have believed this conduct was lawful.

163.    Frances is completely innocent of the arson of 102 Belair Street and the murder of her parents. The prosecution terminated in her favor when the judgments of conviction and sentences were vacated and dismissed.

164.    As a direct and proximate result of Defendants' actions, Frances was wrongly convicted and imprisoned for nearly seventeen years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT III:

**Against Defendants Warmington, Clark, Duggan, Drugan, and Berna**
**Failure to Intercede**
**42 U.S.C. § 1983**

165.    Frances hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

166.    By their conduct and under color of state law, Defendants had opportunities to intercede on behalf of Frances to prevent her false arrest, malicious prosecution, false imprisonment, and deprivation of liberty without due process of law, but, due to their intentional conduct, recklessness, or deliberate indifference, declined or refused to do so.

167.    These Defendants' failures to intercede violated Frances's clearly established constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth, Fifth, and Fourteenth Amendments. No reasonable police officer in 2003 would have believed that failing to intercede to prevent Defendants from fabricating inculpatory evidence; intentionally using coercion to obtain a confession; withholding material, exculpatory, or impeachment evidence; deliberately failing to conduct a constitutionally adequate investigation; and causing Frances to be arrested and prosecuted without probable cause, were lawful.

168.    Frances is completely innocent of the arson of 102 Belair Street and the murder of her parents. The prosecution terminated in her favor when the judgments of conviction and sentences were vacated and dismissed.

169.    As a direct and proximate result of Defendants' actions, Frances was wrongly convicted and imprisoned for nearly seventeen years and suffered the other grievous and continuing damages and injuries set forth above.

### COUNT IV:

**Against Defendants Warmington, Clark, Duggan, Drugan, and Berna**
**Civil Rights Conspiracy**
**42 U.S.C. § 1983**

170.    Frances hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

171.    Defendants, acting within the scope of their employment and under color of state law, agreed among themselves to act in concert in order to deprive Frances of her clearly established Fourth, Fifth, and Fourteenth Amendment rights to be free from unreasonable

searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, and to a fair trial.

172.    In furtherance of the conspiracy Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

      a.    Fabricating inculpatory evidence in reports and pretrial communications with the prosecution, including Frances's purported "confessions" and Drugan's laboratory results;

      b.    Committing perjury during hearings and trials; and

      c.    Engaging in deliberate deception by deliberating suppressing evidence in violation of *Haley v. City of Boston*, 657 F.3d 39, 49 (1st Cir. 2011), and *Mooney v. Holohan*, 294 U.S. 103 (1935), during the pendency of the case.

173.    Frances is completely innocent of the arson of 102 Belair Street and the murder of her parents. The prosecution terminated in her favor when the judgments of conviction and sentences were vacated and dismissed.

174.    As a direct and proximate result of Defendants' actions, Frances was wrongly convicted and imprisoned for nearly seventeen years and suffered the other grievous and continuing damages and injuries set forth above.

### COUNT V:

### Supervisory Liability Against Berna and Crisp
### 42 U.S.C. § 1983

175.    Frances hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

176. Frances's continued wrongful detention was caused by the deliberate indifference and recklessness of supervisory defendants Berna and Crisp when they failed to adequately supervise, discipline, and train the individual MSP Defendants.

177. Specifically, these supervisory defendants were personally involved in the case against Frances and knew or, in the absence of their deliberate indifference and recklessness, should have known of their subordinates' unconstitutional actions and related misconduct in the case.

178. Furthermore, Berna and Crisp failed to supervise the MSP Defendants in constitutionally adequate law enforcement practices, particularly those concerning interviews of suspects, the preservation of investigatory notes, and the production of exculpatory evidence, thereby encouraging and/or permitting these employees to engage in a reckless investigation, to fabricate false inculpatory evidence, and to withhold exculpatory and impeachment evidence, which caused the constitutional deprivations suffered by Frances.

179. These interview techniques, failures in producing exculpatory evidence, fabrications, and other investigative procedures were contrary to accepted methods used by law enforcement agencies. The fact that Defendant supervisors failed to train and supervise their subordinates to ensure that they employed proper investigation procedures demonstrates deliberate indifference and reckless disregard for Frances's constitutional rights.

180. Frances is completely innocent of the arson of 102 Belair Street and the murder of her parents. The prosecution terminated in her favor when the judgments of conviction and sentences were vacated and dismissed.

181.   The personal involvement of Defendant supervisors, through their actions and omissions, proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Frances, including the above-mentioned injuries and damages.

## COUNT VI:

### *Monell* Claim Against Defendant the City of Brockton
### 42 U.S.C. § 1983

182.   Frances hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

183.   Clark's actions in destroying his contemporaneous notes, on information and belief thus depriving defense counsel of potential impeachment or exculpatory evidence, were undertaken pursuant to the policies and practices of the BPD, described above, which were created, maintained, or ratified by policymakers for the City of Brockton with final policymaking authority.

184.   Clark's failure to turn over the police report documenting Jimmy's report of Kenneth's drug dealing and running away from home, further depriving defense counsel of exculpatory evidence, also was undertaken pursuant to the policies and practices of the BPD, described above, which were created, maintained, or ratified by policymakers for the City of Brockton with final policymaking authority.

185.   The policies and practices described in this Count were maintained and implemented by the City of Brockton with deliberate indifference to Frances's constitutional rights.

186.   Frances is completely innocent of the arson of 102 Belair Street and the murder of her parents. The prosecution terminated in her favor when the judgments of conviction and sentences were vacated and dismissed.

187.     As a direct and proximate result of the City of Brockton's actions, Frances's constitutional rights were violated, and she suffered injuries and damages as set forth in this Complaint.

188.     The City of Brockton is therefore liable for the misconduct committed by its officers.

## **PRAYERS FOR RELIEF**

189.     WHEREFORE, Plaintiff Frances Y. Choy demands judgment jointly and severally against Defendants as follows:

  a.  That the Court award compensatory damages to her and against the Defendants, jointly and severally, in an amount to be determined at trial;

  b.  That the Court award punitive damages to her, and against Defendants, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

  c.  For a trial by jury;

  d.  For pre-judgment and post-judgment interest and recovery of her costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

  e.  For any and all other relief to which she may be entitled.

Dated this 31st day of March, 2023.

Respectfully submitted,

By:     /s/Anna Benvenutti Hoffmann

Emma Freudenberger*
emma@nsbcivilrights.com

Anna Benvenutti Hoffmann (BBO #660595)
anna@nsbcivilrights.com
Amelia Green*
amelia@nsbcivilrights.com
Sophia Villarreal*
sophia@nsbcivilrights.com
NEUFELD SCHECK & BRUSTIN, LLP
99 Hudson Street, 8th Floor
New York, New York 10013
Phone: (212) 965-9081

John J. Barter (BBO #032150)
83 Atlantic Avenue
Boston, MA 02110
barterj@msn.com
Phone: (617) 367-2545

* Admitted *pro hac vice*

*Attorneys for Plaintiff Frances Choy*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 31st day of March, 2023, a copy of the foregoing was served on counsel of record for all parties via the Court's ECF system.


/s/ Sophia Villarreal

*Attorney for Plaintiff*