## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| FRANCES Y. CHOY, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:23-cv-10340 |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF BROCKTON, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM IN OPPOSITION TO DEFENDANTS RICHARD SCOTT WARMINGTON, JOHN E. DRUGAN, MICHAEL J. CRISP, AND FRANK MIDDLETON, JR.'S PARTIAL MOTION TO DISMISS

### INTRODUCTION

When Plaintiff Frances Choy was 17 years old, she was the victim of a horrific calamity: her nephew set fire to her home while she and her parents were asleep, killing both her parents. Defendant Massachusetts State Police Officers Detective Richard Scott Warmington, Trooper John Duggan, Chemist John E. Drugan, Sergeant Scott A. Berna, and Captain Michael J. Crisp; Brockton Police Department Detective Eric Clark; and Assistant District Attorney Frank J. Middleton, Jr., exponentially multiplied the tragedy by falsely accusing Frances of participating in the arson, when no true evidence implicated her, fabricating some.[1] Based on Defendants' investigative misconduct, Frances was wrongly convicted and incarcerated for nearly 17 years for

---

[1] Plaintiff's Amended Complaint also alleges claims against the City of Brockton.

crimes she did not commit, before her conviction was vacated in 2020 based on new evidence demonstrating her innocence.

Plaintiff's Amended Complaint amply describes Defendants' investigative misconduct and how their misconduct substantiates well-recognized legal claims, including fabrication of evidence and suppression of exculpatory evidence, in violation of Plaintiff's right to a fair trial. Indeed, there is no dispute this case will proceed to discovery, as the remaining Defendants—Defendants Berna, Clark (co-lead investigator alongside Warmington), Duggan, and the City of Brockton—have not moved to dismiss, effectively conceding the sufficiency of the pleadings. Even the remaining Defendants do not move to dismiss Count I as against Detective Warmington. *See* Partial MTD, 4 n.2.

The Partial Motion to Dismiss has no merit. In violation of the familiar standard requiring Plaintiff's allegations to be taken as true and all reasonable inferences drawn in her favor, Warmington, Drugan, Crisp, and Middleton dispute, mischaracterize, and ignore Plaintiff's factual allegations. Like all Defendants, they will have an opportunity to dispute Plaintiff's allegations during discovery and at trial; they may not do so at the motion-to-dismiss stage. Their legal arguments on qualified immunity fare no better, as the misconduct Plaintiff describes has long been clearly unconstitutional. Accordingly, the Partial Motion to Dismiss should be denied.

## LEGAL STANDARD

A plaintiff's claims survive a motion to dismiss when the pleadings "contain sufficient factual matter to state a claim for relief that is actionable as a matter of law and 'plausible on its face.'" *Abubardar v. Gross*, 542 F. Supp. 3d 69, 74 (D. Mass. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *accord* Fed. R. Civ. P. 12(b)(6). At the pleading stage, the Court must "accept as true all well-pleaded facts set out in the complaint and indulge all reasonable inferences

in favor of the pleader." *Dumont v. Reily Foods Co.*, 934 F.3d 35, 40 (1st Cir. 2019) (internal citations omitted). Courts "may not disregard factual allegations 'even if it strikes a savvy judge that actual proof of those facts is improbable.'" *Manning v. Bos. Med. Ctr. Corp.*, 725 F.3d 34, 43 (1st Cir. 2013) (quoting *Twombly,* 550 U.S. at 556). "If that factual content, so taken, allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged, the claim has facial plausibility." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011) (internal citation omitted).

Notably, "[t]his context-specific inquiry does not demand 'a high degree of factual specificity.'" *Garcia-Catalan v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (quoting *Grajales v. P.R. Ports Auth.,* 682 F.3d 40, 47 (1st Cir. 2012)). "The relevant question . . . in assessing plausibility is not whether the complaint makes any particular factual allegations but, rather, whether 'the complaint warrant[s] dismissal because it failed *in toto* to render plaintiffs' entitlement to relief plausible.'" *Rodríguez–Reyes v. Molina–Rodríguez,* 711 F.3d 49, 55 (1st Cir. 2013) (quoting *Twombly,* 550 U.S. at 569 n. 14). In other words, "the complaint must be read as a whole," and "[t]here need not be a one-to-one relationship between any single allegation and a necessary element of the cause of action." *Garcia-Catalan*, 734 F.3d at 103 (cleaned up).

Viewed holistically, a complaint need only include sufficient facts to provide defendants with fair notice and to state facially plausible claims such that "the complaint create[s] a reasonable expectation that discovery may yield evidence" of those claims.[2] *Id.* (citing *Ocasio-Hernandez,*

---

[2] Plaintiffs also may allege facts "upon information and belief" when those "facts are peculiarly within the possession and control of the defendant . . . or where the belief is based on factual information that makes the inference of culpability plausible." *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2nd Cir. 2010) (internal citation omitted); *Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 190 (D.R.I. 2016) (quoting *Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 786 (D. Md. 2015) (explaining that pleading facts upon information and belief "is a permissible way to indicate a

640 F.3d at 12, 17). Under the standard, courts must take "into account whether discovery can reasonably be expected to fill any holes in the pleader's case;" often allowing for additional latitude when "a material part of the information needed is likely to be within the defendant's control." *Id.* at 104–05. Moreover, "[b]ecause it is not always possible to determine whether a defendant is entitled to qualified immunity prior to discovery, courts often evaluate such a defense at the summary judgment stage." *Abubardar*, 542 F. Supp. 3d at 75.

## FACTUAL BACKGROUND

The facts from Plaintiff's Amended Complaint relevant to the Partial Motion to Dismiss, which must be taken as true, are as follows:

Early in the morning of April 17, 2003, Frances's troubled nephew, Sung Ching ("Kenneth") Choy, set fire to 102 Belair Street in Brockton, Massachusetts, where he lived with Frances and her parents, Yiu ("Jimmy") Choy and Nu Trinh ("Anne") Choy. Am. Compl. at ¶ 34. Both Jimmy and Anne died that same day from severe injuries sustained during the fire. *Id.* at ¶ 41. Officers from two investigating agencies, the Massachusetts State Police ("MSP") and the Brockton Police Department ("BPD"), believed the fire had been intentionally set and correctly suspected Kenneth was the perpetrator. *See id.* at ¶¶ 42–48, 62–65.

The evidence of Kenneth's guilt was overwhelming. *See, e.g.*, *id.* at ¶ 7–9. Kenneth wrote (and admitted to writing) two notes that officers found in his room detailing a step-by-step plan to light 102 Belair Street on fire. *Id.* at ¶¶ 44–45. Unlike Frances, when questioned, Kenneth was able to volunteer accurate details to the police about how he had started the fire—details which only the perpetrator could have known. *See id.* at ¶¶ 84–93. And, at the time of the fire, there was a

---

factual connection that a plaintiff reasonably believes is true but for which the plaintiff may need discovery to gather and confirm its evidentiary basis").

rolled towel at the base of Kenneth's bedroom door to protect him from smoke (consistent with his written plan) and no towel under Frances's or her parents' doors. *See id.* at ¶¶ 36–37, 43, 86.

Kenneth also had a clear motive to harm the Choys: Jimmy had recently reported to the Brockton police that Kenneth was dealing drugs, which he was.[3] *See id.* at ¶ 106. The Choy family knew that Kenneth was involved with drugs and had sold their belongings as a result; Anne had also accused him of stealing her jewelry. *Id.* at ¶ 8. Kenneth and Jimmy had a poor relationship, and Kenneth resented the way Jimmy treated him compared to Frances. *Id.* Kenneth would later admit to a friend that he started the fire at 102 Belair Street and that he did so out of revenge against Jimmy and Anne Choy. *Id.* at ¶¶ 9, 143.

Unlike Kenneth, Frances was not involved in setting the fire or her parents' deaths in any way. *See, e.g.*, *id.* at ¶ 92.  But after an "alert" by a K-9 that the sweatpants Frances had been wearing *might* contain a flammable substance, co-lead investigators Detective Richard Scott Warmington of the MSP and Detective Eric Clark of the BPD erroneously homed in on Frances as having been involved. *Id.* at ¶¶ 4, 56–61. Notwithstanding what should have been Frances's obvious actual innocence, Defendants then began to build a case against her based on false and fabricated evidence. *Id.* at ¶ 61.

No credible evidence ever connected Frances to the crimes. *See id.* at ¶¶ 5–10. Apart from a self-serving statement from Kenneth that was the product of police suggestion, the only "evidence" ever implicating Frances was the result of Defendants' unconstitutional misconduct: Warmington, Clark, and MSP Trooper John Duggan coerced Frances into making a false, vague

---

[3] Defendants also concealed a missing person report Jimmy had filed with the BPD recording his suspicion that Kenneth was dealing drugs; this report was never provided to prosecutors, the court, or defense counsel in advance of Frances's trials, despite its obvious use as exculpatory evidence suggesting a motive for Kenneth to commit the crimes. *Id.* at ¶¶ 106–09, 134.

admission, which she immediately retracted, and then fabricated a second "confession" containing inculpatory details that matched their perceptions about the crimes at that time. *See, e.g.*, *id.* at ¶¶ 75–98, 118–19.

Thereafter, MSP chemist John E. Drugan fabricated a report that Frances's sweatpants had tested positive for the presence of a "gasoline residue"—falsely suggesting she had used an accelerant. *See id.* at ¶¶ 99–104. Before conducting the test on Frances's sweatpants, Drugan was informed by Warmington, Clark, or another MSP/BPD officer that K-9 Gala had alerted to them: his April 22 lab notes (three days before his April 25 GC-MS results) contained handwritten "K-9 Gala" and "+ Gas" notations in the description of Item #1 (the sweatpants). *Id.* at ¶ 100. Drugan also exchanged messages discussing the testing of the sweatpants, including that testing them would involve a destructive test, with ADA Frank Middleton, Jr. *Id.* at ¶ 101. As part of Drugan's fabrication, and contrary to accepted practice at the time, Middleton approved the destructive test in bad faith rather than opting for preserving a portion of the item so that it would be available for subsequent testing by the defense. *See id.* at ¶¶ 101, 153.

After testing the sweatpants and analyzing the testing data, Drugan falsely reported that the sweatpants were positive for the presence of a "gasoline residue." *Id.* at ¶ 102. His own testing data did not support that conclusion. *Id.* Instead, the testing revealed the presence of innocent compounds, such as methyl salicylate. *Id.* at ¶ 103. Methyl salicylate is often included in commercially-available topical analgesics. *Id.* Nonetheless, at trial, the prosecution's case relied heavily on Drugan's false report about the sweatpants because it was the only physical evidence ever purporting to link Frances to the crimes. *Id.* at ¶ 104.

Nonetheless, Defendants arrested Frances and orchestrated her prosecution by false and fabricated evidence. *See id.* at ¶¶ 118–124. Defendants then covered up their misconduct by

destroying their contemporaneous notes, falsely claiming that the BPD station where Frances allegedly confessed was not equipped to record interrogations at the time, that no police officer had access to any recorders, and concealing from the prosecution and defense that both Frances's alleged confessions and the report that there was gasoline residue on her sweatpants were products of their misconduct. *See e.g.*, *id.* at ¶¶ 10–11, 78, 118–124, 129–132.

Beginning on April 17, 2003, the day of the fire, Captain Michael J. Crisp received numerous detailed reports about the investigation and different MSP officers' actions in the case. *Id.* at ¶ 125–28.  Although the reports were formally "to" Crisp, both Crisp and Berna's initials appear on several of the reports, suggesting that both Berna and Crisp read the reports and worked together to closely supervise the investigation. *See id.* at ¶¶ 125, 128. As Captain, Crisp was Berna's supervisor, and Berna was Warmington's direct supervisor. *See id.* at ¶ 126. Berna not only supervised the investigation but also responded to the scene, met with various Defendants, and participated in the collection of evidence (including interviewing Frances's boyfriend). *Id.* at ¶¶ 126–27. Crisp and Berna's collaborative supervision and Berna's own involvement in the investigation suggest that Crisp was at least aware of and permitted the misconduct in the case. *See id.* at ¶¶ 125–28, 176–79 (further alleging that Crisp failed to supervise the MSP Defendants in constitutionally adequate law enforcement practices).

At the time of Frances's interrogation, moreover, Defendants had a pattern and practice of failing to record interrogations so as to more easily pressure suspects to confess and of reducing only the final and most consistent version of an alleged confession to writing. *Id.* at ¶ 11. Furthermore, Berna and Crisp failed to supervise the MSP Defendants in constitutionally adequate law enforcement practices, particularly those concerning interviews of suspects, the preservation of investigatory notes, and the production of exculpatory evidence, thereby encouraging and/or

permitting these employees to engage in a reckless investigation, to fabricate false inculpatory evidence, and to withhold exculpatory and impeachment evidence, which caused the constitutional deprivations suffered by Frances. *Id.* at ¶¶ 176–79. Based on the circumstances, Crisp knew or should have known that the evidence in the case pointed to Kenneth and that the case against Frances was built on coercion and lies. *See id.* at ¶ 128.

Despite Defendants' misconduct, the prosecution's case against Frances remained extremely weak. Frances was tried three times, twice resulting in a hung jury and mistrial. *Id.* at ¶¶ 136–140. After a third trial in May 2011, Frances was wrongfully convicted based on Defendants' false and fabricated evidence, and without the benefit of the exculpatory evidence Defendants hid. *Id.* at ¶ 141. Frances was sentenced to life in prison without the possibility of parole. *Id.* at ¶¶ 14, 141.

Frances continued to fight to prove her innocence. *Id.* at ¶ 142. On September 17, 2020, Frances's motion for post-conviction relief was granted based on a multitude of factors, including that: (1) new expert evidence demonstrated that there was actually no gasoline residue on Frances's sweatpants; (2) new evidence of misconduct by BPD Defendants, including misrepresentations around the documentation of Frances's statements; (3) new evidence that Kenneth acted alone, including that he had confessed to starting the fire; (4) evidence of additional fires at the Choy residence started while Frances was incarcerated; and (5) new evidence of racial bias against Frances, including racist and sexist emails and drawings from the prosecutors. *Id.* at ¶¶ 15, 143.

On September 17, 2020, the Plymouth County Superior Court vacated Frances's conviction. *Id.* at ¶ 16. On September 29, 2020, the Plymouth County District Attorney discontinued its prosecution of Frances. *Id.* at ¶ 17. Frances was wrongfully imprisoned from the age of seventeen until the age of thirty-four. *Id.* at ¶ 18.

**ARGUMENT**

**I.      Plaintiff's Due Process claims against Drugan and Middleton should proceed to discovery (Count I).**

**A.      Drugan fabricated testing results that there was gasoline residue on Frances's sweatpants.**

Defendant Drugan purports to assert a qualified immunity defense. *See* Partial MTD, 11 (argument header). Drugan does not—and cannot—argue that he is entitled to qualified immunity for fabrication of evidence. *See id.* Instead, he raises a barebones challenge to the sufficiency of the factual allegations against him, improperly ignoring some of the factual allegations and disputing others. Plaintiff amply alleges that Drugan fabricated key evidence falsely implicating Frances: Drugan falsely reported that Frances's sweatpants were positive for the presence of a "gasoline residue," even though his own testing data did not support that conclusion. Am. Compl. at ¶¶ 102–03. This alone is more than sufficient to meet Plaintiff's low bar at the pleading stage. *See Ocasio-Hernandez*, 640 F.3d at 14 (reversing district court for improperly requiring high level of specificity for factual allegations).

But there is far more. Plaintiff is innocent of the arson of her family home; she did not use accelerant and there was no gasoline or gasoline residue on her sweatpants. Nevertheless, after an accelerant detection K-9 alerted to the *possibility* of a flammable substance on Frances's sweatpants, she became the prime suspect. *See* Am. Compl. at ¶¶ 56–61. But as Drugan would have known, such dogs cannot definitively confirm the presence of absence of a specific substance and can alert based on many harmless substances, including those frequently found in cosmetics. *Id.* at ¶ 59. Nevertheless, Drugan's pre-testing notes describe Frances's sweatpants as "positive" for gas. *Id.* at ¶ 100. At this point, Defendants Warmington, Clark, and Duggan had also fabricated a confession from Frances, including the false claim that she had admitted to filling plastic

containers with gas to accelerate the fire. *See id.* at ¶¶ 93–96. With this pre-determination in mind, Drugan consulted with Middleton who ultimately approved a destructive test of the sweatpants, contrary to standard practice. *See id.* at ¶¶ 100–01, 153. Drugan's destructive testing meant that no additional or independent tests of the sweatpants would be possible. *Id.* at ¶ 101.

Critically, Drugan's own testing did not demonstrate the presence of gasoline or gas residue on Frances's sweatpants. *Id.* at ¶¶ 102–03. Instead, it indicated the probable presence of methyl salicylate—an innocent substance often included in commercially-available topical analgesics. *Id.* Nevertheless, Drugan falsely reported that Frances's sweatpants were positive for the presence of gasoline residue. *Id.* This false report was heavily relied on in the prosecution, as it was the only physical evidence ever purporting to link Frances to the crimes. *Id.* at ¶ 104. Ultimately, new evidence that Drugan's report was false—and there was no gasoline residue on Frances's sweatpants—was a basis for overturning Frances's conviction. *Id.* at ¶ 15.[4] Taken as true, these allegations are more than sufficient for Plaintiff's Due Process claim to proceed against Drugan.

**B.     Middleton acted in bad faith.**

Next, Defendants move to dismiss the claim against Defendant Middleton. Again, although the argument is framed as about qualified immunity, in actuality Defendants disregard or recharacterize Plaintiff's factual allegations.

---

[4] Defendants' citation to the post-conviction decision is curious—particularly in light of the purported complaint that Plaintiff has insufficiently described the testing data. The post-conviction court had no need to address whether Drugan intentionally misrepresented his testing results to order Plaintiff's conviction vacated. But the court describes in detail how new expert analysis concludes Drugan's report was false, and how this false report was a critical focus at Frances's trial. *See Commonwealth v. Choy*, No. 0383-CR-00300, 2020 WL 10053106, at *5–7 (Mass. Super. Ct. Sept. 17, 2020). Thus even assuming arguendo the Court could properly consider this source outside the pleadings on Defendants' motion to dismiss, it does not help their argument.

Defendants concede that it has been clearly unconstitutional since long before 2003 to destroy exculpatory evidence in bad faith. *See* Partial MTD, 10 (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)). That is what Plaintiff alleges here: that Middleton, acting in bad faith and in communication with Drugan, ordered the destruction of the exculpatory physical evidence. Defendants improperly ignore and dispute Plaintiffs' specific factual allegations, as well as the broader context alleged. *See, e.g.*, *Garcia-Catalan*, 734 F.3d, at 103 (explaining that a "one-to-one relationship between any single allegation and a necessary element of the cause of action" is not required and that the complaint need only "create a reasonable expectation that discovery may yield evidence" of wrongdoing).

Here, Plaintiff alleges (and the Court must take as true) that (1) Frances was arrested based on the fabricated confession but insisted on her innocence; (2) no other physical evidence inculpated Frances; (3) at this point Middleton was communicating with Drugan about the testing on the sweatpants; (4) a K-9 had previously alerted to the sweatpants but it was known this did not definitively indicate the presence of any flammable substance; (5) Middleton ordered that Drugan conduct the destructive test rather than opting to preserve a portion of the sweatpants for subsequent testing; (6) this destructive testing was unnecessary and contrary to established standards in 2003; (7) when the destructive testing nonetheless indicated the presence of an innocent substance, on the sweatpants, Drugan fabricated that the results demonstrated the presence of gasoline residue; (8) as part of the larger fabrication that there was gasoline residue on Frances's sweatpants.

Before testing, Drugan's notes reflect a pre-determination that Frances's sweatpants were positive for gas. Am. Compl. at ¶ 100. Only after discussing with Drugan did Middleton approve a destructive test rather than opting to preserve a portion of the sweatpants for subsequent testing.

*Id.* at ¶ 101. Plaintiff alleges that this decision was unnecessary and contrary to established standards in 2003. *Id.* at ¶ 153. Instead of engaging with the meat of Plaintiff's allegations, Middleton refutes them and reframes them in the light most favorable to him—an approach in direct opposition to the motion to dismiss standard.  At this stage, Plaintiff is not required to prove her claims. Because discovery can reasonably be expected to reveal evidence in support of Middleton's bad faith, and because evidence of his bad faith is solely within Middleton's control, the Court should afford Plaintiff additional leeway here. *See Garcia-Catalan*, 734 F.3d, at 104–05.

## II.     Warmington and Drugan are not entitled to qualified immunity on Plaintiff's claim for malicious prosecution (Count II).

Defendants Warmington and Drugan argue that they also are entitled to qualified immunity on Plaintiff's claim for malicious prosecution under the Fourth Amendment. Not so. The conduct Plaintiff alleges—fabricating evidence and framing Plaintiff for crimes she did not commit—was clearly unconstitutional for decades before Warmington and Drugan's misconduct against Choy.

In *Limone v Condon*, the First Circuit expounded on how obvious it was that such conduct was unconstitutional:

> This is easy pickings. Although constitutional interpretation occasionally can prove recondite, some truths are self-evident. This is one such: if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit.

372 F.3d 39, 44–45 (1st Cir. 2004). The Court ultimately held the prohibition on fabricating evidence was clearly established by 1967. *Id.* at 48.

 In 2013, addressing a claim alleging unlawful pretrial detention, the First Circuit "made explicit what has long been implicit in our case law": that *one* of the sources for the "'self-evident'

prohibition against manufactured evidence in the pretrial detention context is the Fourth Amendment's guarantee of freedom from seizure but upon probable cause. *See Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 101 (1st Cir. 2013) (citing *Limone*, 372 F.3d at 44–45). As the First Circuit made clear both in *Hernandez-Cuevas* and in *Limone*, the misconduct alleged here—deliberately fabricating evidence and framing individuals for crimes they did not commit—has been clearly established as unconstitutional since well before 2003.

Since then, district courts within the circuit have recognized that the prohibition against malicious prosecution was clearly established before *Hernandez-Cuevas*. *See, e.g.*, *Cosenza v. City of Worcester, Massachusetts*, 355 F. Supp. 3d 81, 98 (D. Mass. 2019) (holding that the right to be free from malicious prosecution was clearly established by 2000); *Davis v. Murphy*, No. 13-CV-11900-IT, 2018 WL 1524532, at *8 (D. Mass. Mar. 28, 2018) (denying qualified immunity on summary judgment for conduct in 2008 because the reasoning in *Hernandez-Cuevas* shows "that there was a consensus of cases of persuasive authority sufficient to signal to a reasonable officer that particular conduct would violate a constitutional right") (internal quotations omitted). Similarly, before *Hernandez-Cuevas,* district courts found this prohibition was clearly established. *See, e.g.*, *Colon-Andino v. Toledo-Davila*, 634 F. Supp. 2d 220, 238 (D.P.R. 2009) (denying qualified immunity because there was "no doubt that such actions constitute malicious prosecution, including a material fabrication," and that no reasonable officer would believe such conduct lawful); *Rodriguez-Esteras v. Solivan Diaz*, 266 F. Supp. 2d 270, 282 (D.P.R. 2003) (denying qualified immunity because "the parameters of the right to be free from malicious prosecution were sufficiently clear" in 2000, given "the near unanimity among the Circuits" on the matter).

Any judicial debate as to which amendment houses the prohibition against malicious prosecution, moreover, "is of no consequence to the question of whether the right was clearly

established, because the proper inquiry is whether the *right* itself—rather than its *source*—is clearly established." *See, e.g.*, *Russo v. City of Bridgeport*, 479 F.3d 196, 212 (2d Cir. 2007); *see also Jacobs v. Cumberland County*, 8 F.4th 187, 197 & n.9 (3d Cir. 2021) (denying qualified immunity where conduct was clearly unconstitutional, even where there was ambiguity over which constitutional amendment controlled).

Accordingly, Warmington and Drugan are not entitled to qualified immunity because it was clearly established by 2003 that fabricating evidence to frame an innocent person was unconstitutional. *See* 355 F. Supp. 3d at 98 (explaining that "the relevant inquiry is whether the *underlying right* was clearly established at the time of Plaintiff's malicious prosecution" not "whether the cause of action" was clearly established at the time).

### III.    Warmington and Drugan are not entitled to qualified immunity on Plaintiff's failure to intercede claims (Count III).

Warmington and Drugan's cursory argument—divorced from any factual context—that they are entitled to qualified immunity for failure to intercede also fails. First, the First Circuit has long described actionable failure to intervene claims in terms that encompass a broad range of constitutional rights. *See Torres-Rivera v. O'Neill-Cancel*, 406 F.3d 43, 54 (1st Cir. 2005) ("A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in [his or her] presence by other officers." (emphasis omitted) (quoting *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988))); *Clark v. Taylor*, 710 F.2d 4, 9 (1st Cir. 1983) ("Liability under section 1983 may be imposed both for action that deprives a plaintiff of a constitutional right and for failure to act, when there is a duty to act, to prevent such a deprivation.). Second, the specific constitutional rights at issue are obvious. No reasonable officer could have believed he had no obligation to intercede when he knew fellow officers with whom he was working on the same investigation were fabricating evidence and framing an

innocent person. To be clear, Plaintiff has alleged both that these Defendants are directly liable for fabricating evidence and that they conspired with the other Defendants. The precise role each Defendant played, however, may be contested and will not be known until discovery is completed; accordingly Plaintiff is permitted to plead failure to intercede in the alternative. *See* Fed. R. Civ. P. 8(d)(2). As here, "it is not always possible to determine whether a defendant is entitled to qualified immunity prior to discovery," and Defendants' qualified immunity arguments are better suited for summary judgment. *See Abubardar*, 542 F. Supp. 3d at 75.

## IV.    Plaintiff's section 1983 civil conspiracy claims against Warmington and Drugan should proceed to discovery (Count IV).

Yet again, Defendants couch as a qualified immunity argument what is really a boilerplate challenge to the sufficiency of the pleadings. Warmington and Drugan cannot dispute that, if they were personally involved in the conspiracy to fabricate evidence and frame Frances, they are not entitled to qualified immunity. Nor can they dispute that Plaintiff's factual allegations, taken as true and viewed holistically, amply suggest an improper conspiracy—which may explain why Defendants improperly ignore Plaintiff's factual allegations. Due "to the clandestine nature of criminal conspiracies, the law recognizes that the [requisite] illegal agreement may be either 'express or tacit' and that a 'common purpose and plan may be inferred from a development and collocation of circumstance.'" *United States v. Flores-Rivera*, 56 F.3d 319, 324 (1st Cir. 1995) (quoting *United States v. Sanchez*, 917 F.2d 607, 610 (1st Cir. 1990)). It is possible that during the same investigation, while they are communicating about the case, Warmington and Drugan just happened to independently fabricate evidence implicating the same innocent suspect: Warmington a false confession suggesting that Frances had used gas to accelerate the fire, and Drugan a report falsely claiming Frances's sweatpants had gasoline residue on them. But it is certainly *plausible* that this parallel misconduct was *not* a coincidence, but rather the result of an

15

unlawful agreement. That is all Plaintiff must show at this stage. *See Ocasio-Hernandez*, 640 F.3d at 12. Plaintiff's conspiracy claims against Warmington and Drugan should proceed to discovery.[5]

## V.  Plaintiff sufficiently alleges a claim of supervisory liability against Crisp (Count V), which should proceed to discovery.

Crisp's motion to dismiss should be denied. Plaintiff alleges that Crisp's subordinates abridged Plaintiff's constitutional rights, that Crisp had actual or constructive notice of the violations, and that Crisp nevertheless permitted the unconstitutional misconduct to continue, in reckless indifference to Frances's constitutional rights.[6] That describes a constitutional violation for which Crisp can be held liable. *See Guadalupe-Baez v. Pesquera*, 819 F.3d 509, 514–15 (1st Cir. 2016) (cleaned up) (explaining that a claim for supervisor liability has two elements: (1) "that one of the supervisor's subordinates abridged the plaintiff's constitutional rights," and (2) "that the supervisor's action or inaction was affirmatively linked to that behavior in the sense that it could be characterized as supervisory encouragement, condonation, or acquiesces or gross negligence amounting to deliberate indifference"); *see also* Partial MTD, 12–15 (describing supervisory liability standard).

While supervisory liability turns on a supervisor's acts or omissions, "the supervisor need not have 'directly engage[d] in a subordinate's unconstitutional behavior.'" *Bazinet v. Thorpe*, 190 F. Supp. 3d, 229, 239 (D. Mass. 2016) (quoting *Guadalupe-Baez*, 819 F.3d, at 515). A supervisory liability claim may proceed, for example, when a supervisory defendant is aware that a subordinate

---

[5] Notably, other members of the conspiracy, including Clark (Warmington's counterpart from the BPD and co-lead investigator on the case), Duggan, and Berna, did not move to dismiss the civil rights conspiracy claims against them.

[6] Plaintiff has clearly alleged constitutional violations by Crisp's subordinates, including all allegations against Duggan and, at a minimum, the Due Process allegations in Count I which Warmington has chosen not to challenge in the Partial Motion.

fabricated evidence and the supervisor nevertheless fails to take corrective action. *See id.* at 239–40 (holding that the plaintiff's supervisory liability claim survived summary judgment because the subordinate defendant fabricated evidence "in the context of an ongoing conversation" between the supervisory defendant and others such that it was reasonable to conclude that the supervisory defendant acquiesced in the subordinate's violation of the plaintiff's rights); *see also Montrond v. Spencer*, No. 17-10505-ADB, 2021 WL 5040318 (D. Mass. Oct. 29, 2021) ("While thinly pleaded, notice pleading is all that is required at this stage, and there are sufficient, albeit broad, allegations that the Defendants were aware of the actions of their subordinates and did nothing in response."). Defendants' argument to the contrary once more disputes Plaintiff's factual allegations, narrowly focuses in on cherry-picked statements instead of considering the complaint as a whole, and impermissibly draws inferences in Crisp's favor—all contrary to the standard on a motion to dismiss.

For example, Defendant claims the Amended Complaint "fails to allege that any supervisory relationship existed between Captain Crisp and any other Defendant." Partial MTD, 13. The Amended Complaint alleges that Crisp is a supervisory defendant, that he was the person to whom the MSP Defendants addressed their reports on the case, and that he read and initialed them, in addition to closely monitoring the developments of the case. Am. Compl. at ¶¶ 125–28. The clear implication is that Crisp had supervisory responsibility over the MSP investigators— why else would he be reviewing and signing off on their investigative reports? *See id.* Notably Defendants do not deny that Crisp played this role.

Nor does Plaintiff seek to hold Crisp liable merely for reading the reports, as Defendants claim. *See* Partial MTD, 14. Rather, Plaintiff alleges that Crisp knew or should have known of the investigative misconduct committed by his subordinates and failed to take corrective action. *See*

Am. Compl. at ¶¶ 125–28, 176–79. In addition to the misconduct by Drugan described above, the Amended Complaint alleges repeated and blatant investigative misconduct by MSP investigators Warmington and Duggan. *See, e.g.*, *id.* at ¶¶ 75–98 (alleging that Warmington and Duggan fabricated Plaintiff's confession and arrested her based on evidence they knew was false). The Amended Complaint alleges that Warmington and Duggan coerced Frances and fabricated her confession, *id.* at ¶¶ 75–98, 149–51; that they deliberately suppressed material evidence, *see id.* at ¶¶ 149–52; that, acting in concert, they caused Frances to be arrested, charged, and prosecuted for a crime for which they lacked probable cause, *see id.* at ¶¶ 158–64; that they failed to intervene to stop their fellow officers from violating Frances's constitutional rights, *see id.* at ¶¶ 165–69; and that they conspired along with other MSP and BPD Defendants to violate Frances's constitutional rights, *see id.* at ¶¶ 170–74. It also alleges that Berna—Warmington's direct supervisor who personally participated in gathering evidence and was present at the police station when Warmington, Duggan, and Clark coerced and fabricated Frances's false confession—was personally aware of the investigative misconduct.[7] And it alleges investigative actions that would have been red flags to an experienced supervisor like Crisp. For example, Warmington and Duggan failed to record Frances's interrogation or the alleged inculpatory statements they claimed she made, or even to reduce them to a written statement for her to review. Particularly given the paucity of evidence against her, this failure makes no sense if Warmington and Duggan were acting in good faith.

Based on these allegations, it is reasonable to infer that Crisp was aware of the overwhelming evidence against Kenneth and the lack of evidence against Frances. It is also reasonable to infer that Crisp recognized the obvious investigative flaws, which at the very least

---

[7] Berna has not moved to dismiss any of the claims against him.

suggested misconduct by the investigating officers. And the Court may infer that Berna—who was personally aware of Warmington's misconduct—discussed it with Crisp. The communications among supervisors at the MSP is exactly the type of information in Defendants' control, that Plaintiff cannot access without discovery, making this another situation where "some latitude may be appropriate in applying the plausibility standard." *Garcia-Catalan*, 734 F.3d at 104–05. It is certainly possible that discovery will reveal that Crisp was out of the loop, defrauded by the investigating officers and the line supervisor, Berna. If that is the case, Plaintiff would obviously not seek to pursue any claims against Crisp. But based on the information now known there is a "reasonable expectation that discovery may yield evidence" of Crisp's supervisory liability. *Id.* at 103. That is all Plaintiff must show at this stage. Crisp's motion to dismiss should be denied.

## CONCLUSION

For the reasons stated above, Plaintiff respectfully requests that the Court deny Moving Defendants' Partial Motion to Dismiss.


DATED: May 16, 2023.

<div style="margin-left: 40%">

Respectfully submitted,


By:     /s/Sophia Villarreal

Emma Freudenberger*
emma@nsbcivilrights.com
Anna Benvenutti Hoffmann (BBO #660595)
anna@nsbcivilrights.com
Amelia Green*
amelia@nsbcivilrights.com
Sophia Villarreal*
sophia@nsbcivilrights.com
NEUFELD SCHECK & BRUSTIN, LLP
99 Hudson Street, 8th Floor
New York, New York 10013

</div>

Phone: (212) 965-9081

John J. Barter (BBO #032150)
83 Atlantic Avenue
Boston, MA 02110
barterj@msn.com
Phone: (617) 367-2545

* Admitted *pro hac vice*

*Attorneys for Plaintiff Frances Choy*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 16th day of May, 2023, a copy of the foregoing was served on counsel of record for all parties via the Court's ECF system.

/s/ Lucia Geng

*Paralegal for Plaintiff*