UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 23-10340-RGS

FRANCES Y. CHOY

v.

CITY OF BROCKTON, ERIC CLARK,
RICHARD SCOTT WARMINGTON,
JOHN DUGGAN, JOHN E. DRUGAN,
SCOTT A. BERNA, MICHAEL J. CRISP,
And FRANK J. MIDDLETON, JR.

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION TO DISMISS

May 24, 2023

STEARNS, D.J.

This action arises out the vacatur of the conviction of Frances Y. Choy for arson and the murder of her parents and the discontinuation of further prosecution. Choy now asserts that the City of Brockton, one of its detectives, and several officers in the Massachusetts State Police (MSP) violated her constitutional rights by, *inter alia*, fabricating inculpatory evidence and destroying exculpatory evidence. Defendants Richard Scott Warmington, John E. Drugan, Michael J. Crisp, and Frank Middleton, Jr., move to dismiss claims against them pursuant to Fed. R. Civ. P. 12(b)(6). For the following reasons, the court will allow the motion in part and deny it in part.

## BACKGROUND

The facts, drawn from the Amended Complaint [Dkt # 44] and the documents it incorporates by reference, and viewed in the light most favorable to plaintiff as the nonmoving party, are as follows.[1]  In the early morning hours of April 17, 2003, Choy's nephew, Kenneth Choy (Kenneth), intentionally set fire to the house in which he lived with Choy and her parents.  By the time the Brockton Fire Department responded to the scene, Choy's parents had sustained severe injuries.  They died in a hospital later that day.

An overwhelming amount of physical evidence linked Kenneth to the crime.  Investigators, for example, found two handwritten notes planning how to set fire to the house in his bedroom, and a rolled towel was found underneath his bedroom door.  Kenneth also had a motive to set the fire, as Choy's father had recently reported Kenneth to the Brockton Police for dealing drugs and her mother had accused Kenneth of stealing her jewelry.  Nonetheless, because an accelerant-detecting dog alerted to the pair of

---

[1] Given the extent of the wrongdoing alleged in the Amended Complaint, the court limits its recitation of facts to only those aspects of the investigation that are relevant to the issues raised in defendants' Motion to Dismiss.

sweatpants Choy had been wearing at the time,[2] investigators shifted their focus to Choy. They did so despite knowing that accelerant-detecting dogs can only alert investigators to the *possible* presence of flammable liquids and that many harmless substances, such as nail polish remover, can also cause a dog to alert.

Under the guise of having them reclaim personal property salvaged from the fire, Warmington brought Kenneth and Choy to the Brockton Police station the night of April 17, 2003. Warmington, Eric Clark, and John Duggan proceeded to interrogate Choy for hours, ignoring her requests for a lawyer. Even though the station was equipped with recording devices, Choy's interrogation was not recorded.[3]

Kenneth was interrogated separately from Choy. Although he denied involvement at first, when confronted with his handwritten notes, he admitted to setting the fire. Defendants told Kenneth that he could lessen his blame if he said another person was involved. Kenneth then falsely incriminated Choy, claiming that she was the one who had started the fire.

---

[2] The dog did not alert to Kenneth's clothing, but this was consistent with information in Kenneth's handwritten notes, which included the step of changing his clothing after using the accelerant.

[3] The following year, in an unrelated case, the Massachusetts Supreme Judicial Court strongly encouraged police to record interrogations. *See Commonwealth v. DiGiambattista*, 442 Mass. 423, 446-448 (2004).

Defendants then confronted Choy with Kenneth's confession. Eventually, after hours of pressure to confess, Choy stated, "[F]ine I planned it!" Immediately thereafter, Choy recanted, telling officers that she was not involved in planning the fire. Despite the retraction, she was escorted to the booking area and handcuffed to a railing. Clark then asked Choy a series of leading questions regarding how the crime allegedly occurred and she responded yes to each question. Defendants fabricated a report of this exchange, falsely suggesting that Choy had volunteered this information.

According to Warmington's and Clark's police reports, Choy again admitted to setting the fire while she was being held outside the booking area. This alleged confession was not reduced to writing, nor was it recorded. The only account of the supposed confession was typed up days later in a collaborative effort by Warmington, Clark, and Duggan.

On April 22, 2003, Warmington, or another officer working with him, spoke with Drugan, the chemist assigned to handle laboratory testing of Choy's sweatpants. Drugan's notes of this meeting falsely indicate that an accelerant-detecting dog had detected the presence of gasoline residue on Choy's sweatpants. Drugan then spoke with Middleton, seeking approval to perform a destructive test on Choy's sweatpants. Even though standard

practice would have been to preserve a portion of the item for defense testing, Middleton gave Drugan the requisite authorization.

The destructive test did not detect the presence of gasoline residue. Instead, the results indicated the probable presence of a compound called methyl salicylate, which is often found in commercially-available topical analgesics.[4] Drugan nonetheless reported that the Choy's sweatpants had tested positive for gasoline residue.

While Choy remained in jail, Warmington learned that Choy's father had reported Kenneth to the Brockton Police for dealing drugs in January of 2003. Warmington also learned that Kenneth had reportedly confessed to setting the fire to a friend. Defendants did not disclose either of those exculpatory events to Choy's defense team until years after her conviction. Additionally, in 2009, while Choy was incarcerated pending trial, and while Kenneth was free, Choy's house was set on fire two days in a row. Although defendants reported the first fire to prosecutors (they failed to report the second one), the occurrence of either fire was withheld from Choy's defense team.

---

[4] Choy's father had applied a pain-relieving ointment to her legs the night of April 16, 2003, because her feet hurt from wearing high heels during a shift at her part-time job.

Throughout this investigatory period, Warmington and other MSP officers made numerous detailed reports to Crisp, a captain in the MSP, about the state of the investigation and their actions. Crisp read these reports carefully and closely monitored the case.

## DISCUSSION

Qualified immunity is a judicial doctrine meant to shield public officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Its purpose is to enable public officials "to act without fear of retributive suits for damages except when they should have understood that particular conduct was unlawful." *Limone v. Condon*, 372 F.3d 39, 44 (1st Cir. 2004).

"The First Circuit has adopted a two-part test to assess qualified immunity." *Cosenza v. City of Worcester,* 355 F. Supp. 3d 81, 94 (D. Mass. 2019). First, a court must decide "whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right." *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009). Second, a court must decide "whether the right was 'clearly established' at the time of the defendant's alleged violation." *Id.*, quoting *Pearson v. Callahan*, 555 U.S. 223, 232

(2009). "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks and citation omitted).

### I. Middleton

Middleton moves to dismiss Count I, which alleges that he "acted in bad faith to destroy exculpatory evidence" when he authorized Drugan to perform unnecessary destructive testing on Choy's sweatpants "rather than opting for preserving a portion of the item," as was required by existing investigatory standards. Am. Compl. ¶¶ 101, 153. He contends that the Amended Complaint fails to plausibly establish that any constitutional violation occurred because, at the time he approved use of the test, "he had no way of knowing whether [it] would yield inculpatory, exculpatory, or inconclusive evidence." Mem. in Supp. of Mot. to Dismiss (Mem.) [Dkt # 48] at 9. Alternatively, he maintains that, even if his conduct did violate Choy's constitutional rights, a reasonable official in his "position would have no reason to believe conducting a [destructive] test would violate the constitution." *Id.* at 10.

The court finds these arguments unpersuasive. Uncertainty as to the exculpatory value of destroyed evidence only bars a claim where a plaintiff

does not credibly allege bad faith. *See Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) ("We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."); *see also Magraw v. Roden*, 743 F.3d 1, 8 (1st Cir. 2014) (a criminal defendant may prevail on a due process claim tied to evidence that is "merely potentially useful to the defense" if "he establishes that the state acted in bad faith"). Because the Amended Complaint indisputably *does* allege bad faith,[5] and because Middleton does not dispute that the bad faith destruction of potentially useful evidence would clearly violate then-established law, a *Youngblood* dismissal would be inappropriate at this stage of the proceeding.

## II. Drugan

Drugan similarly moves to dismiss Count I, which, as asserted against him, is premised on the alleged fabrication of a report that Choy's sweatpants had tested positive for the presence of gasoline residue. Drugan challenges

---

[5] Middleton does not challenge the sufficiency of the allegation of bad faith. But even if he did, viewing the facts in the light most favorable to plaintiff, the court can reasonably infer that, having discussed the matter with Drugan, Middleton authorized the destructive testing knowing that it would enable Drugan to report that Choy's sweatpants had tested positive for gasoline residue, consistent with the alert of the accelerant-detecting dog, even if no gasoline residue was present.

the sufficiency of the claim as pled, contending that the assertion of fabrication is "conclusory and unsupported." Mem. at 11.

Review of the allegations in the Amended Complaint belies the suggestion that the pleading is inadequate. Choy pleads several concrete facts in support of her claims, including that: (1) Drugan's notes reflect the presence of gasoline residue prior to any testing, even though an accelerant-detecting dog can only alert officers as to the possible presence of a flammable substance; (2) the results from the destructive test indicate "the probable presence of a compound called methyl salicylate, which is often included in commercially-available topical analgesics," *i.e.*, not any gasoline residue, Am. Compl. ¶ 103; and (3) even though these test results did not support the conclusion that gasoline residue was present, Drugan "falsely reported that the sweatpants were positive for the presence of a 'gasoline residue,'" *id.* ¶ 102. To the extent Drugan seeks greater specificity, he applies too strict a burden at the motion-to-dismiss stage, which merely requires notice pleading.

### III. Drugan and Warmington

Drugan and Warmington seek to dismiss Counts II, III, and IV as asserted against them. Because they present identical arguments in favor of dismissal, the court will address the claims ensemble.

9

### a. Count II

Count II is a claim for malicious prosecution. It is premised on Drugan and Warmington having fabricated evidence to prosecute Choy. Sidestepping the first prong of the qualified immunity test, Drugan and Warmington seek dismissal on the ground that the "constitutional right to be free from malicious prosecution was not clearly established until" nearly a decade after Choy's arrest and prosecution. Mem. at 15.

While at least two other cases from this district have credited defendants' argument, *see Schand v. City of Springfield*, 380 F. Supp. 3d 106, 135 (D. Mass. 2019); *Echavarria v. Roach*, 2017 WL 3928270, at *8 (D. Mass. Sept. 7, 2017), the court declines to do so here. The proper inquiry under the second step of the test is whether the underlying *right* was clearly established at the time of the alleged violation, not the cause of action itself. *See Cosenza*, 355 F. Supp. 3d at 98; *Davis v. Murphy*, 2018 WL 1524532, at *9 (D. Mass. Mar. 28, 2018); *Russo v. City of Bridgeport*, 479 F.3d 196, 212 (2d Cir. 2007). Drugan and Warmington cannot plausibly maintain that a reasonable official would not have known that fabricating evidence to further the prosecution of criminal defendant was unlawful in 2003, when Choy was

arrested. That the First Circuit did not explicitly[6] identify the vehicle through which to bring a malicious prosecution claim until 2013 does not change the decades of law establishing that the illegality of "deliberately fabricating evidence and framing individuals for crimes they did not commit." *See Limone*, 372 F.3d at 45*; see also Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 100 (1st Cir. 2013). The court accordingly denies the motion to dismiss Count II.

### b. Count III

Count III is premised on Drugan's and Warmington's failure to intercede on Choy's behalf "to prevent her false arrest, malicious prosecution, false imprisonment, and deprivation of liberty without due process of law." Am. Compl. ¶ 166. As with Count II, Drugan and Warmington limit their challenge to the clearly established prong, arguing that, "outside of the excessive force context, there was no 'clearly established'

---

[6] As noted in *Davis*, "*Hernandez-Cuevas* was not the groundbreaking case [defendants] make[] it out to be." 2018 WL 1524532, at *8. "It merely [made] explicit what ha[d] long been implicit in our case law." *Hernandez-Cuevas*, 723 F.3d at 100; *see also id.* at 97 n.7 ("Though the question of whether the Fourth Amendment provides substantive protection during the pretrial period is a question of first impression in this circuit, it cannot be seriously argued that an objectively reasonable officer in Martz and Taylor's position would have been ignorant of the fact that fabricating evidence was constitutionally unacceptable.").

11

authority in 2003 imposing a duty on law enforcement officers to intercede if a constitutional violation occurs in their presence." Mem. at 17.

In her opposition, Choy fails to identify any case law establishing or even implying the existence of an affirmative duty to intervene with respect to constitutional violations occurring outside of the excessive force context. At best, she merely notes that the First Circuit has sometimes "described actionable failure to intervene claims in terms that encompass a broad range of constitutional rights."[7] Pl.'s Opp'n to Mot. to Dismiss [Dkt # 53] at 14. But the fact that the First Circuit has used broad language that *could* be read to extend beyond the excessive force context is not enough to find a duty to intervene clearly established. *Cf. Schand*, 380 F. Supp. 3d at 135; *Cosenza*, 355 F. Supp. 3d at 100-101; *Echavarria*, 2017 WL 3928270, at *11. The court accordingly allows the motion to dismiss Count III on qualified immunity grounds.

### c. Count IV

Count IV is premised on the existence of a civil conspiracy. Drugan and Warmington move to dismiss the claim as insufficiently pled.

---

[7] The cases cited by Choy for this proposition, however, either postdate the alleged wrongdoing in this case, *see Torres-Rivera v. O'Neill-Cancel*, 406 F.3d 43 (1st Cir. 2005), or are contingent on (and thus do not themselves establish) the existence of an affirmative "duty to act" to prevent the alleged deprivation, *see Clark v. Taylor*, 710 F.2d 4, 9 (1st Cir. 1983).

As relevant here, civil conspiracy "derives from 'concerted action,' whereby liability is imposed on one individual for the tort of another." *Kurker v. Hill*, 44 Mass. App. Ct. 184, 188 (1998), quoting *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1564 (1st Cir. 1994). "Key to this cause of action is a defendant's substantial assistance, with the knowledge that such assistance is contributing to a common tortious plan." *Kurker*, 44 Mass. App. Ct. at 189. Here, Choy alleges that both Drugan and Warmington fabricated evidence against her. She further alleges that, before Drugan fabricated his report, Warmington (or someone connected to him) discussed Choy's alleged confession and the accelerant-detecting dog's alert with Drugan. As Drugan's report is consistent with the information disclosed during this meeting despite the existence of contrary test results, the court can reasonably infer that the two engaged in concerted action to fabricate evidence. It accordingly denies the motion to dismiss this claim.

### IV. Crisp

Crisp moves to dismiss Count V, which seeks to hold him responsible for Choy's alleged wrongful detention under a theory of supervisory liability. In the Section 1983 context, a finding of supervisory liability cannot be premised on *respondeat superior*. *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Instead, liability must derive from "the official's own

13

individual actions," *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009), "whether through direct participation" in the alleged misconduct "or through conduct that amounts to condonation or tacit authorization" of that conduct, *Camilo-Robles v. Zapata*, 175 F.3d 41, 44 (1st Cir. 1999). While mere negligence is not enough to create the requisite affirmative link to a plaintiff's injury, a supervisor who "lacks actual knowledge of censurable conduct . . . may be liable for the foreseeable consequences of such conduct if he would have known of it but for his deliberate indifference or willful blindness, and if he had the power and authority to alleviate it." *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994)

Crisp mounts several attacks against the sufficiency of the Amended Complaint, none of which carry the day at this early juncture. First, Crisp argues that the Amended Complaint "fails to allege that any supervisory relationship existed." Mem. at 12. This contention is easily disposed of. Choy pleads that the defendants in the MSP made reports "to" Crisp. Am. Compl. ¶ 125. The court can reasonably infer the existence of a supervisory relationship from this allegation.

Crisp next asserts that the Amended Complaint fails to plead that he "received notice of an underlying constitutional violation." Mem. at 13. The court disagrees. Choy alleges that Crisp "received numerous, detailed

reports about the investigation and different MSP officer's actions in the case" and "closely monitored the investigation." Am. Compl. ¶¶ 125, 128. The court can reasonably infer that Crisp had at least constructive notice of serious underlying constitutional violations if he was closely monitoring the investigation and received reports of his subordinate's actions. For example, even assuming he was not aware that evidence was fabricated, he presumably would have known (1) that an accelerant-detecting dog cannot determine whether gasoline residue is present such that Drugan's notes were inaccurate; (2) that there was copious evidence of Kenneth Choy's guilt which was not disclosed to Choy's defense team; (3) that Warmington failed to record Choy's interrogation or even reduce it to a written statement for her review; and (4) that, under alleged department policy, Drugan should have preserved a portion of Choy's sweatpants for defense testing.

Crisp also challenges whether deliberate indifference and causation have been adequately pled. But the court can, at this stage in the litigation, reasonably infer deliberate indifference and causation from the seriousness of the alleged underlying constitutional violations in this case and Crisp's failure to take any corrective action. *See Guadalupe-Baez v. Pesquera*, 819 F.3d 509, 515 (1st Cir. 2016) ("[A] plaintiff may, for example, prove causation by showing inaction in the face of a 'known history of widespread abuse

15

sufficient to alert a supervisor to ongoing violations.'"), quoting *Maldonado-Denis*, 23 F.3d at 582; *see also Justiniano v. Walker*, 986 F.3d 11, 21 (1st Cir. 2021) (noting that, although separate requirements, causation and deliberate indifference "are often intertwined in these cases"), quoting *Young v. City of Providence*, 404 F.3d 4, 26 (1st Cir. 2005).

Crisp's last argument, although framed in terms of the "clearly established" step, essentially relitigates the adequacy of the pleading. No matter how the question is presented, however, whether Crisp knew or should have known of any pattern of constitutional violations committed by his subordinates, or whether, as he argues, he reasonably believed that any apparent violations were "isolated instances" of misconduct, Mem. at 15, cannot be decided as a matter of law at the motion-to-dismiss stage of the proceedings. The court will therefore withhold judgment on this issue until a factual record is developed through the ordinary course of discovery.

## ORDER

For the foregoing reasons, the motion to dismiss is <u>ALLOWED IN PART</u> and <u>DENIED IN PART</u>.  Count III is dismissed as to Drugan and Warmington.  All other claims survive this motion and shall proceed to discovery.

SO ORDERED.

<u>/s/ Richard G. Stearns        </u>
UNITED STATES DISTRICT JUDGE